

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **NATHANIEL WOODS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **2:16-cv-01758-LSC** |
| | ) | |
| | ) | |
| **CYNTHIA STEWART,** | ) | |
| ***WARDEN*, ET. AL,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## MEMORANDUM OF OPINION

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Nathaniel Woods ("Woods"), a death row inmate at Holman Correctional Facility in Atmore, Alabama. Woods challenges the validity of his 2005 conviction on four counts of capital murder and sentence of death in the Circuit Court of Jefferson County, Alabama. Upon thorough consideration of the entire record and the briefs submitted by the parties, the Court finds that Woods's petition for habeas relief is due to be denied.

## I.     FACTS OF THE CRIME

The Alabama Court of Criminal Appeals summarized the facts of this case in its opinion on direct appeal as follows:

Birmingham police officers Carlos Owen, Harley A. Chisolm III, Charles R. Bennett, and Michael Collins were on duty on June 17, 2004. Officer Collins testified that he was on patrol when he heard a radio transmission from Officer Owen, announcing that he was getting out of his patrol car on 18th Street at "the green apartments." Officer Collins was familiar with the apartments because they were in an area that had "been a drug problem area for years." The apartments were located four or five blocks from the police precinct. Officer Collins went to the green apartments to back up Officer Owen, and he parked behind the apartments a few minutes after he heard Officer Owen's radio call. Before Officer Collins arrived, Officer Owen had been checking the license tags and the vehicle identification numbers of the vehicles located behind the apartments, and he was standing near the back door of one of the apartments when Officer Collins arrived. Officer Owen told Officer Collins that a man at the back door had cursed at him and yelled at him and had told him to "get the fuck off his property." Officers Owen and Collins went to the back door of the apartment; Officer Collins testified that Nathaniel Woods was the man standing inside the doorway of the apartment. Woods then cursed at both officers repeatedly and told them to "[g]et the fuck off our property." Officer Collins saw a female in a white T-shirt behind Woods. Officer Collins testified that it appeared that a third person was also inside the apartment because someone pulled a window covering back and said "[f]uck the police" several times.

Officer Collins testified that Woods told Officer Owen "[y]ou always hide behind that badge and gun," and "[t]ake off that badge and I will fuck you up." Officer Owen then took off his badge, but Woods stayed behind the door. At that point, a female neighbor walked up to Officer Owen and called him by his nickname, Curly; after they spoke, Officer Owen put his badge back on and he and the female neighbor walked toward his patrol car. Officer Chisolm then arrived in his patrol car, and the other officers told him what had occurred. Officers Collins and Owen drove into the alley behind the apartments and spoke about the incident. Officer Owen said that the man at the door had told him that his name was Nathaniel Woods. Officer Collins checked Woods's name using the in-car computer; specifically, he checked the City of Birmingham's files in the event

that Woods had been arrested in Birmingham, and he checked the National Crime Information Center ("NCIC") files. The NCIC files indicated that a person named Nathaniel Woods, with an address in that area and of an age near the age Officer Collins estimated Woods to be, had an outstanding misdemeanor assault warrant from the City of Fairfield Police Department. However, Officer Collins testified that, at that point, he could not verify that the man in the apartment was the same person who had the outstanding warrant for his arrest.

Officers Collins and Owen contacted Officer Chisolm by radio and asked him to go to the precinct to print out a picture of the person wanted by the Fairfield Police Department so they could determine whether that person was the person who had identified himself to Officer Owen as Nathaniel Woods. They also asked Officer Chisolm to contact the Fairfield Police Department to confirm that the warrant was still outstanding. Another officer later saw Officer Chisolm sitting at the NCIC computer at the Birmingham Police Department; he was printing a picture of a mug shot, and he had a printout of a "hit confirmation," indicating that Nathaniel Woods had an outstanding warrant. Fairfield Police Department dispatcher Jackie Buchanan confirmed that a warrant for Woods had been issued on February 18, 2004, and that it remained outstanding. Officer Chisolm received a radio call from a Birmingham dispatcher at 1:17 p.m., informing him that the Fairfield Police Department had confirmed that the warrant was still active. Officer Chisolm then radioed the Birmingham dispatcher that he, Officer Owen, and Officer Collins would be leaving the precinct momentarily to try to arrest Woods. Officer Chisolm radioed Officer Steven Sanders and told Officer Sanders that he had a suspect with an outstanding warrant who had been taunting the police, that is, standing inside a door saying, "You can't get me. You can't get me," and then running back into the apartment. Officer Sanders told Officer Chisolm that he would drive to the address on 18th Street to assist Officer Chisolm in serving the warrant, but that he was approximately 10 minutes from the address.

While the police were confirming the validity of the warrant for Woods's arrest, Woods remained at the apartment. Marquita McClure, Woods's girlfriend, testified that in June 2004 she was

living in the apartment with Woods, whom she called by the nickname "Nate." Kerry Spencer, Woods's codefendant in this case, also lived in that apartment, and McClure knew Spencer by his nickname, "Nookie." Another young woman, Markesha Williams, was staying at the apartment and Spencer's brother, Courtney, also occasionally came to the apartment. McClure testified that Woods and Spencer were close friends, and that the two sold drugs from the apartment. She testified that the pair used a "doorman," someone who stood at the back door to look out for the police or to see if someone they did not know was trying to come inside. McClure also testified that guns were kept in the apartment; she saw long guns and revolvers, and she testified that Woods and Spencer carried the guns with them while they were in the apartment. McClure said that she saw Spencer walking around the apartment with a long gun strapped to his back on the day of the shootings, and she testified that the night before the shootings both Spencer and Woods were in the backyard shooting guns.

McClure testified that on the morning of the shootings, Woods had been outside but came inside and was standing at the screen door when Officer Owen drove up. She heard Woods and Officer Owen talking like they were angry, and when she walked into the room, she heard Woods tell Officer Owen to take his badge off. McClure said that Officer Owen took his badge off, and then the next-door neighbor came over and told Officer Owen to put his badge back on, which he did. The officers left soon after. While Woods and Officer Owen were talking, McClure said, Spencer was standing at the window of the back bedroom. After the police left, Woods and Spencer said they did not like the police and they said, "I'll kill the mother fuckers." She had on previous occasions heard Spencer make similar statements, but she did not pay attention when Woods or Spencer made these statements because she did not take them seriously.

McClure left the apartment to run an errand, and she asked Woods to come with her. However, Woods told her that he was going to stay with Spencer in case the police came back. McClure said that when Woods walked her outside to the car, Woods was carrying his revolver. McClure did not return before the shootings took place.

Officer Collins testified that after the officers received confirmation from the Fairfield Police Department that the warrant against Woods was valid, he and Officers Owen and Chisolm drove to the green apartments to serve the warrant. As they arrived at Woods's apartment, Officer Bennett arrived; Officer Collins said that he did not know how Officer Bennett was notified of their attempt to execute the warrant at the apartment. Officers Chisolm and Bennett went to the front of the apartment, and Officers Collins and Owen went to the back of the apartment. Officer Collins testified that, as he and Officer Owen walked toward the back door, a man who had been working on one of the vehicles parked near the apartment walked away and said, "I don't want no part of this. I don't want nothing to do with this. I don't want no part of this." Woods was again standing inside the screen door, and he immediately began cursing and telling the officers to "get the fuck out" of there. Officer Owen told Woods that they had a warrant for his arrest on a misdemeanor assault charge from Fairfield and that he needed to step outside. Officer Collins said that Woods refused to come outside and that he responded to Officer Owen's request by saying, "Fuck you. I don't have no warrant. Fuck you." Woods repeatedly stated that there was no outstanding warrant for his arrest, and he demanded to see the warrant. The officers then called Officer Chisolm on the radio and asked him to come to the back of the apartment with the picture and the NCIC printout. Officer Chisolm walked around to the back of the apartment and showed Woods the mug shot and the NCIC printout, but Woods continued to argue that he had "no papers," i.e., that a warrant had not been issued. Officer Chisolm told him that he was under arrest and to step outside. Officer Collins testified that Woods told the officers that "[i]f you come in here, we'll fuck you up."

Officer Collins testified that, all of a sudden, Woods turned and ran from the kitchen further into the apartment. Officer Chisolm grabbed the screen door, opened it, and followed Woods inside the apartment. Officer Owen then went into the apartment; Officer Collins followed behind him. None of the officers had their weapons drawn when they entered the apartment. Officer Collins testified that when he stepped into the kitchen of the apartment, he saw that

Officers Chisolm and Owen were in the doorway between the kitchen and the living room and they appeared to be holding Woods. He could hear Woods say, "Okay. I give up. Just don't spray me with that mace." Officer Collins then heard someone radio that "[t]hey are coming out the front door." Officer Collins testified that Officers Chisolm and Owen had the doorway blocked, so he turned and ran toward the back door so that he could join Officer Bennett at the front door. As he turned, Officer Owen said to him, "'Mike, they are going out the front.'"

Officer Collins testified that, as he got to the back door, he heard "a little shuffling behind me and shooting started." He heard numerous shots and he felt a slapping sensation on his leg by his holster. Officer Collins testified that he ran toward the back of his patrol car for cover. He twice radioed the dispatcher that shots had been fired. From his position behind his patrol car, Officer Collins radioed a "double aught" call, a seldom-used radio code meaning that an officer needs all possible assistance because his life is in danger. Officer Collins saw Kerry Spencer standing at the doorway of the apartment shooting in his direction; he could hear the bullets hit the vehicle, and he could hear glass shattering. Several other officers then arrived at the scene. Later that afternoon, Officer Collins discovered that his holster had a hole in the side, as did his pants, and that he had sustained an injury to the back of his upper right thigh. He found a metal fragment in the lining of his pants pocket near the hole in his pants.

[. . .]

Several officers who responded to the double-aught call testified at trial. Officer Hugh Butler testified that he was less than a mile from the green apartments when he heard the call. When he arrived, he saw that another officer was already at the scene and was standing to the side of the front door, armed with a shotgun. When Officer Butler walked toward the front door, he saw Officer Bennett on the ground, face up, "obviously dead with a hole in his face and smoke coming out if it." As he ran up to the doorway, he looked behind him and noticed that Officer Terrance Hardin and another officer had arrived. One of

the officers called out that there was a weapon in the grass; that weapon was an SKS assault rifle with a magazine attached. Officer Hardin picked up the assault rifle and secured it in Officer Butler's patrol car. Officer Butler called into the apartment for Officer Owen and Officer Chisolm, but he received no answer. He called for anyone else in the apartment to surrender, but received no response to that directive. He and several other officers then entered the apartment. Officer Butler testified that he saw Officers Owen and Chisolm and that they were dead. When Officer Fred Alexander saw Officer Bennett outside the apartment, he radioed dispatch to report that an officer was down. When Officer Alexander saw that Officers Owen and Chisolm were dead, he radioed dispatch to advise that two other officers were down. The officers found a handgun in the bathroom and two long guns, one with the stock sawed off, in a bedroom. After the officers cleared the apartment and determined that no one else was inside, they then went outside and found Officer Collins. Sgt. Ruben Parker, who was retired at the time of trial, testified that he and Officer J.D. Gray responded to the double-aught call, and they kept a perimeter around the scene when they arrived. Sgt. Parker said that another officer was near Officer Bennett's body and noticed a Glock brand gun that was 6 to 12 inches from Officer Bennett's right hand. Sgt. Parker kept the gun until he turned it over to an evidence technician.

Many officers canvassed the neighborhood after the shootings. Sgt. Daniel Carr, who was retired at the time of trial, testified that he came upon a house where three black males were sitting on the porch. He testified that one of the men was Woods, and he said that Woods appeared to be very relaxed as he sat on the porch and spoke with the officer. After Sgt. Carr confirmed by looking at a photograph that the man looked like one of the suspects, he asked Woods for his name and Woods gave Sgt. Carr his full name. Woods was taken into custody. When Woods was patted down, the officers found no identification on him, but they found two .22 caliber bullets in a pants pocket. At 2:56 p.m., an officer radioed that Woods was in custody.

Sgt. James Blanton testified that on the day of the shootings, he was working in the vice-narcotics division of the Birmingham Police

Department, but when he heard the double-aught call, he and his partner closed their operation and responded to the location of the shooting. After completing some searches of houses in the area, he was informed that a suspect was in a residence at a certain address on 18th Street. Sgt. Blanton arrived at that residence and he saw his partner attempting to coax Kerry Spencer out of the attic. Sgt. Blanton said that he and a detective saw Spencer's hands moving toward them, so they reached into the attic and pulled Spencer out.

Fernando Belser, whose nickname is "Blue," was inside the apartment when the officers were shot and killed. Belser testified that he had been staying at the apartment on 18th Street with Woods and Spencer for three or four months. He said that Woods's girlfriend, Marquita McClure, and Spencer's girlfriend, Markesha Williams, were also staying at the apartment in June 2004. Belser testified that Woods and Spencer made money by selling drugs from the apartment and that he was the "doorman" at the apartment. He stated that a "doorman" determines who gets to come inside to purchase drugs and handles most of the transactions of money and drugs between the purchaser and drug dealer. According to Belser, drug purchasers would come in the back door of the apartment, and were generally not permitted past the kitchen into the living room unless Woods or Spencer gave them permission. Belser testified that "[i]f somebody tried to go past the—through the kitchen into the living room without permission, or if they tried to go and they were being told to stop in the kitchen, they would probably, you know, get hurt pretty bad or something could happen to them. . . ." Belser testified that Woods and Spencer were the primary purveyors of drugs in the apartment and that they sold mostly crack cocaine. On an average day, Belser said, Woods and Spencer sold drugs to 100 to 150 customers and a lot of money flowed through the apartment.

Belser testified that handguns and shotguns were kept in the apartment and that Woods and Spencer carried guns on them. Woods typically carried a small handgun, but Spencer carried all kinds of guns, including an assault rifle. Belser testified that he first saw the SKS assault rifle used in the shooting the night before when Spencer test-fired it outside the apartment. Belser testified that, before the day

of the shootings, he had heard Spencer say that he did not like the police, that he was tired of them harassing him, and that if they did not stop harassing him, he would "light them up," meaning that he would shoot them. Belser also said that he had heard Woods make statements similar to those Spencer had made.

Belser testified about the police officers' first stop at the apartment on June 17, 2004; that testimony was substantially similar to that given by other witnesses. Belser left the apartment after the officers did, and he was gone for an hour or two. After he returned, the police came back a second time. According to Belser, Woods was standing inside the screen door at the back of the house when Officers Owen and Chisolm arrived in the back. He heard Woods and Officer Chisolm discussing a warrant, then Woods began to "retreat, backpedal" into the living room. Belser said that Officer Chisolm then snatched the screen door open and came inside the kitchen. Officer Chisolm walked just past the threshold between the kitchen and the living room, shaking a can of Mace, and Woods told Officer Chisolm not to spray him with the Mace. Belser testified that he did not see Officer Chisolm spray the Mace; that he did not cough or smell anything; and that Woods was not coughing. At that point, Belser said, Spencer came out of the bedroom carrying the SKS assault rifle that was later recovered in the yard of the residence. Belser said that Spencer opened fire on Officer Chisolm and Officer Chisolm tried to return to the kitchen. Belser did not look toward the kitchen anymore after Spencer began shooting but knew that Spencer fired several shots into the kitchen and out of the back of the apartment. Woods tried to go out of the front door, Belser said, but when Woods opened it, Woods told Spencer that they had "another one right there." Because the front door opened inward, Belser's view was blocked, and he could not see anyone outside. Spencer turned and fired shots out the front door. Belser testified that Woods then ran out the front door and that Spencer followed him within seconds; the pair ran across the street. Belser walked to the front door and saw Officer Bennett on the ground; the shooting had stopped, he said, and he stepped over the officer's body and walked down the street.

On cross-examination, Belser acknowledged that he had previously pleaded guilty to felony charges of possession of a forged instrument. He continued to maintain that Spencer and Woods had expressed that they were tired of the police messing with them and that he had heard Spencer say that he would "light them up" and that Woods agreed with Spencer. However, when Belser was asked whether he could determine whether Spencer and Woods were serious when they made such remarks, Belser replied that it was hard to say with Spencer. He added that it was "just hard to say if he meant it or not because he kept a certain demeanor. He be—seems like he was dead serious, but he would be joking. And then you would think he was joking, but he would be dead serious . . . ." Belser also testified that if he had believed that Spencer and Woods intended to shoot police officers, he would not have stayed at the apartment. Finally, Belser testified that, when Woods opened the front door and announced there was "another one," he did not tell Spencer to shoot him; instead, Belser said, when Woods opened the door and saw the other officer, "it scared him."

John Prather testified that he lived in a four-room house commonly known as a "shotgun-style house" located on 18th Street in Ensley at the time of the shooting. He said that he was familiar with the green apartments and could see them from his house. On the day of the shooting, he was watching television in the middle room of the house, the bedroom; two acquaintances were also in the house, a young woman named Marshay and Michael Scott. Prather testified that he heard many sirens that afternoon and, suddenly, two men kicked open his back door. He identified Woods as one of the men and said that Spencer was the second man. According to Prather, Woods and Spencer came into his bedroom and sat down; Spencer sat to his right and Woods sat to his left, near a heater. Prather said that he was concerned for his safety, and he asked Woods and Spencer what was going on. They told him that he would be taken care of when it was all over, and he knew they were talking about paying him, though no specific dollar figure was mentioned. Prather said that he overheard Woods tell Spencer, "You came through for me."

Prather testified that he became restless after he saw reports on the television involving the three officers being shot at the green apartments, and he knew that Woods and Spencer were involved. Although he was very apprehensive about getting up, Prather said, he eventually got up and walked out of the bedroom and into the living room. Prather then walked out of his house and sat on the porch of the house next door. According to Prather, Woods followed him and sat on the steps at the house next door. Police were all around the area. After approximately 10 minutes, Prather walked back to his house and sat on the banister of his porch; Woods followed him and sat on the steps of his porch. Prather testified that a police officer walked over and spoke with Woods, and Woods gave the officer his name and surrendered. Finally, Prather testified that when Woods first burst into his house, he did not appear to have a hard time breathing, and his eyes had no tears and his nose was not running.

Michael Scott testified that he was in Prather's house, which was approximately one block from the green apartments, when he heard shots fired. He admitted that he had previously been inside the green apartments to purchase cocaine; he said he had purchased drugs approximately 10 times from Woods and Spencer. After he heard the shots fired that day, he yelled to Prather, and he then heard a commotion in the back of the house. Scott said that he turned and saw Woods and Spencer come through the back door of Prather's house. Woods walked into the living room where Scott was standing. Woods was not coughing and he had no trouble breathing, Scott said; Scott also said that Woods had no tears and his nose was not running. Woods said, "They fucked with the wrong niggers. We shot their asses," and then said something about having been sprayed with Mace. According to Scott, Woods then went into the bedroom with Prather and Spencer. When Prather came into the living room and suggested to Scott that they go outside, he turned to see where Spencer had gone and heard a commotion in the attic, so he assumed that Spencer had climbed into the attic. Scott said that a police officer eventually came to the porch and recognized Woods from a photograph he was holding, and that Woods was taken into custody.

Officer Cedric Clifton testified that he was working in the evidence-technician unit of the Birmingham Police Department on June 17, 2004, and that he photographed the scene and collected evidence at Prather's house. Officer Clifton testified that he collected a wallet from beneath the couch in the living room that contained Woods's identification card and Social Security card, among other things. He also found a 9mm handgun in the attic of the residence next to the entryway to the attic. The gun was loaded, and it had 1 round in the chamber and 10 rounds in the clip. Officer Clifton testified that in the bedroom, behind the heater, he recovered a second handgun, a Beretta brand 9mm gun. Officer Clifton testified that "[t]he weapon had been hit right behind where you pull the trigger," and that he was not able to remove the magazine from the weapon as a result of the damage. Subsequent testimony established that the Beretta handgun found behind the heater in Prather's house was Officer Owen's service weapon. Officer Clifton was unable to locate any fingerprints on the weapon.

Evidence technicians and a crime-scene investigator photographed and diagramed the scene where the shooting occurred and collected evidence from the apartment, in the front and back yards, and in a nearby vacant lot. The officers testified that they collected numerous weapons, shell casings, spent bullets, and live ammunition from the scene. Finally, Officer Chester White, an evidence technician, testified that he received a Glock 19 9mm semiautomatic weapon from Sgt. Ruben Parker. That gun had been located near Officer Bennett's body and was identified as his service weapon. Officer White testified that the gun was fully loaded. Officer White also received the SKS assault rifle that had been found in the front yard of the residence; two live rounds remained in the assault rifle. Three loaded weapons—a shotgun, a rifle, and a revolver—were also recovered from other rooms in the apartment. Officer White photographed the bodies of the deceased officers and removed their duty belts and items from their pockets. Officer Owen had no weapon on his duty belt, and the gun holster on the belt had been damaged. When he collected Officer Chisolm's duty belt, Officer White noted that the holster that usually contained a Mace canister was empty and that the canister of Mace was located near the back door of the

apartment. Officer White testified that, after he received information from the coroner about the gunshot wound to Officer Bennett's face, he returned to the scene and dug a bullet from the ground beneath where Officer Bennett's head had been lying.

Charles Underwood, an investigator in the forensics unit of the Birmingham Police Department, testified that he photographed the backyard of the apartment and collected shell casings there. He observed bullet holes in Officer Collins's patrol car—in the radiator, the windshield, and the strobe light bar of the car—and bullet holes in another car parked behind the apartment. A vehicle in front of the apartment had bullet holes in the front fender and in the hood. Inv. Underwood collected bullet fragments from inside Officer Collins's patrol car and from the car parked in front of the apartment. Inv. Underwood also collected two spent shell casings from the front yard near Officer Bennett's body. Finally, Inv. Underwood testified that he conducted a trajectory examination of the cars so that he could determine the path the bullets took when they were fired and where the barrel of the gun was in relation to where the shots were fired.

Dr. Gary Simmons, a forensic pathologist with the Jefferson County Coroner's Office, testified that he conducted the autopsies on the three officers. He provided details of the examinations of each officer's body, and concluded that each had died of multiple gunshot wounds. Dr. Simmons testified that Officer Chisolm and Officer Owen sustained several gunshot wounds to the back that then exited the front of the body; that the stippling on the skin indicated that when the bullet was fired into Officer Bennett's face, the gun was 12 inches or less from him; and that one of the bullets fired at Officer Chisolm was fired from less than two feet away. Dr. Simmons testified that the more serious wounds the officers sustained, as opposed to the graze wounds, were typical of those caused by high-powered rifles because the bullets left large holes in the bodies, particularly as the bullets exited the bodies. Dr. Simmons recovered bullet fragments from each officer's body and secured them for further analysis. Dr. Simmons testified that Officers Chisolm and Bennett were wearing bulletproof vests, but he noted that several bullets went through the vests because

those vests are typically made to stop bullets from handguns, not from high-powered rifles.

Mitch Rector, a firearm-and-toolmark examiner with the Birmingham Police Department, testified that he examined the weapons, bullet fragments, and shell casings recovered in this case. He identified numerous shell casings and bullets that had been fired from the SKS assault rifle recovered at the scene. Rector testified that some of the bullet fragments recovered during the autopsies of Officers Bennett and Chisolm had been fired from the SKS assault rifle. The fragments recovered from Officer Owen's body were similar to the type of bullet fired from the SKS assault rifle, but he could not state conclusively that the fragments were from a bullet fired by the SKS assault rifle he tested. Rector testified that he examined the officers' weapons and that Officer Bennett's weapon and Officer Chisolm's weapon functioned normally, but that Officer Owen's firearm had a large defect in the metal near the trigger guard that severely damaged the gun and rendered it inoperable. In addition, the holster on Officer Owen's duty belt was damaged, and Rector testified that the damage to the gun and holster were typical of what he would expect if they had been struck by a high-velocity bullet such as one fired by an SKS-type rifle. Rector also found that a portion of a bullet had been left inside Officer Owen's holster, and he stated that the appearance of the bullet fragment was consistent with what is commonly found in SKS ammunition. None of the shell casings recovered at the scene had been fired from any of the officers' weapons. Finally, Rector testified that he conducted a distance study regarding the gunshot wound to Officer Bennett's face to determine how far the muzzle of the SKS assault rifle was from his face when it was fired. He determined that the end of the barrel of the SKS assault rifle was from two to six inches from the officer's face when it was fired.

Greg Parker testified that on December 4, 2003, before the shootings in this case, he was employed as a police officer by the City of Fairfield. While he was assisting other officers who were attempting to serve a warrant, Woods—who was not the person the officers were looking for—came from behind the residence and walked toward him. Officer Parker said that Woods was wearing a long trench coat, that he

had his hands in his pockets, and that he looked suspicious. Officer Parker told Woods to remove his hands from his pockets because his job made him suspicious of people with their hands in their pockets because they might have a firearm; Officer Parker also told him that a sudden movement could get him shot. Officer Parker said that, in response, Woods "said he could have shot me." Officer Parker asked Woods if he had a gun, and Woods said he did, so Officer Parker and the other officers restrained him. The officers removed from Woods's pants what appeared to be an operational handgun but was actually a pellet gun. Woods was arrested on a charge of menacing.

William Powell, a Jefferson County deputy sheriff assigned to the jail, testified that when Woods was in jail on December 14, 2004, after the shootings in this case, he closed the door of Woods's cell, and Woods called him derogatory names and then told him that he was "hiding behind [his] badge just like the other three mother fuckers." Woods also told Deputy Powell that if he won his case and was released, he was going to come looking for him. Deputy Powell filed a report on the incident.

Deputy Vince Gillum testified that he was employed by the Jefferson County Sheriff's Office and that he was assigned to the jail. He stated that, on June 22, 2005, he observed contraband on the wall of Woods's cell—a drawing pasted to the wall—so he removed it. The drawing was admitted into evidence, and we have examined it. The drawing depicts two men shooting firearms. One man is shooting an assault rifle and three flaming skulls are depicted in the blasts from that weapon, and the other man is shooting two handguns. The drawing contains a heading at the top, "NATE $ NOOKIE," and depicts street signs at an intersection of "18th Street and Ensley." When Deputy Gillum removed the drawing, Woods said that the drawing was his and that he wanted it back.

Deputy Sheriff Tonya Crocker testified that she was also assigned to the jail and that on July 29, 2005, she searched Woods's cell. She found some broken razors and some drawings that concerned her. After obtaining a search warrant, Deputy Crocker seized several items from the bunk where Woods slept. The items included a

handwritten document and two copies each of two separate drawings depicting "Nate" and "Nookie" shooting on 18th Street. One of the drawings depicted flaming skulls coming from the blast of what appears to be an assault rifle and the other drawing depicted a police car with many bullet holes in it.

Detective Phillip Russell of the Birmingham Police Department testified that the trial court had ordered Woods to provide handwriting samples, so he obtained those samples from Woods using the procedure he had been instructed to use by the handwriting analyst who would later examine the samples. Det. Russell was instructed to have Woods repeatedly rewrite the words on the document found in his cell. We have reproduced those words exactly as they appear on the document:

> "Seven execution styles murders
> I have no remorse because I'm the fuckin murderer
> Haven't you ever heard of a killa
> I drop pigs like Kerry Spencer
> So when I walk around strapped
> One time bust the caps and watch pigs clapse
> Snapp, adapt to this because I needs no adapter
> this is just the first chapter."

Det. Russell testified that the document appeared to be an adaptation of the lyrics of a rap-style song by an artist named Dr. Dre, which he located by an Internet search.

Steven Drexler testified that he had recently retired from the Alabama Department of Forensic Sciences, where he had been with the questioned document and handwriting unit. He testified that he compared Woods's known writing samples that were obtained by Det. Russell with the writing on the document obtained during the search of Woods's cell. Drexler testified that, in his opinion, the document was written by Woods.

Woods presented several witnesses in his defense. Markesha Williams testified that she had known Kerry Spencer for about five

days and that she had visited Spencer at the green apartments. She was at the apartment on the day of the shooting. Williams testified that, when the officers first came to the house, she heard Woods and Spencer talk back and forth with the police. She stated that Spencer told an officer that if the officer took his badge off Spencer would come outside, so the officer took his badge off, but Spencer remained inside. She said that the police left after approximately 10 minutes. She testified that, after the police left, Woods said that if the police kept coming back he was going to shoot them but that she did not take him seriously. Later, Williams saw two police cars drive down the back alley. She went into the living room, and Woods was standing at the screen door. When the two officers came to the door, Williams said, Woods asked them why they kept coming back "messing with 'em." Williams testified that after Woods and the police argued, the officers "snatched the door off the hinges," wrestled Woods to the ground, and beat him. She said that she did not see anyone spray Mace; that she has asthma; and that she would have gotten sick if she had smelled or been around Mace. Williams testified that Courtney Spencer woke up his brother, who was sleeping; that Kerry Spencer went into the bedroom and looked out the window; and that he returned to the living room and grabbed the gun. Spencer said something to the police and then started shooting. Williams said that a third officer opened the front door, and Spencer shot him. She testified that Woods got up off the ground after the shooting started and that he was panicky. Williams testified that Woods did not open the door and he did not tell Spencer that another officer was at the front door. She said that she was the first person to run from the apartment after the shooting; that she did not see Woods or Spencer running from the apartment; and that she did not see who shot Officer Bennett in the face. Williams acknowledged that, when she gave a statement to the police after the shooting, she had said that based on what she had heard Woods and Spencer say after the police left the first time, she knew there would be a confrontation if the police returned, and that when the police officer asked if Woods and Spencer had planned the confrontation, she told him that it was planned. However, at trial, she testified that what she meant by her statement was that she expected a verbal confrontation, and that she did not expect anyone to shoot a police officer.

Brandon Carter, an inmate, testified that he knew Woods from being incarcerated with him. He identified some of the drawings removed from Woods's cell during the search and testified that he had copied them from the original and had given the copies to Woods. Carter testified that Woods did not ask him to draw the pictures for him.

Travis Dumas, also an inmate, testified that he, like Fernando Belser, had worked as a "doorman" at the apartment from which Woods and Spencer sold drugs. He testified that he was at the apartment during the morning of the shooting and that he was awakened by someone kicking the front door. According to Dumas, Woods went to the front door and argued back and forth with the person. Dumas said that he recognized the voice of the person as Officer Owen's voice because Officer Owen had been patrolling his neighborhood for many years. He heard Officer Owen tell Woods that he would be back. Dumas said that while Woods argued with Officer Owen at the front door, Spencer was arguing with officers at the back door; Dumas recognized Officer Chisolm as one of the officers at the back door. After the police left, Dumas heard Spencer say that if the police came back, he was going to "bust 'em," meaning he was going to shoot them. Dumas said that he did not take Spencer's comment seriously because he had heard other people talk about shooting the police before and he had said it himself. Dumas testified that he left the house to steal items from a grocery store nearby, and that after he "stole a whole bunch of everything," he tried to return to the apartment but he could not because the police were everywhere.

Woods also called codefendant Kerry Spencer to testify on his behalf; Spencer invoked his Fifth Amendment privilege and refused to testify. However, the trial court permitted the attorneys for the State and for Woods to read into the record Spencer's testimony from his own trial. At his trial, Spencer admitted that he sold drugs from the apartment where the shooting occurred. He testified that he bought the SKS assault rifle the night before the shooting, and that he had test-fired it in the backyard. On the day of the shooting, Spencer said, Officer Owen kicked the front door of the apartment early in the

morning, between 6:00 a.m. and 8:00 a.m. He and Woods looked out the window and recognized the officer. Spencer said that Officer Owen returned to the apartment later that morning, parked in the backyard, and said something to Woods, who was standing at the back door, about stolen cars. Woods cursed at Officer Owen repeatedly, Spencer testified, and told him to get off the property. Spencer said that he went to a window in the bedroom and also cursed at Officer Owen; he told the officer to "get his weak ass the fuck on." He said that Officer Owen told him that he had enough body bags for him too. According to Spencer, Officer Collins then drove into the yard and Officer Owen spoke to him. Officer Owen returned to the back door and tried to get him and Woods to come outside, but they continued to curse at him. Woods told Officer Owen that he hid behind his badge; Spencer said he agreed with Woods and told Officer Owen that if he took his badge off, they would come outside. Officer Owen then took the badge off and told them to come out, but they refused. Spencer said that a female neighbor then walked over and told Officer Owen to stop acting like that, and he put his badge back on and left soon after. Before he left, Spencer said, Officer Owen said he would be back when he got off work.

Spencer testified that he then heard Woods speaking to someone and he saw that Woods was speaking to Officer Chisolm. Spencer said that he told the officer that he needed "to get the fuck away from the apartment. That he a fuck boy. . . . Basically just telling him get the fuck on." He said that Officer Chisolm let them know that the police would be back and led Spencer to believe that he would be killed when they returned. Spencer said that he was in fear for his life. Spencer also said that neither he nor Woods gave their names to either of the officers.

Spencer testified that he was asleep on the couch when the officers returned; the SKS assault rifle was beside his leg. He said that he heard a snap and got up and went into the bedroom so he could look out the window. Spencer stated that he saw the police cars outside and that he then heard a struggle, but that he did not know the police were in the house. Spencer said that when he came out of the bedroom, Woods was coming out of the kitchen holding his face as if

he were in pain; that he heard something beside him; and that, as he turned around, he saw Officer Chisolm raise his gun so he opened fire. Spencer said that he believed that the officer was going to shoot him and that he had no alternative but to fire his weapon. Spencer fired until Officers Chisolm and Owen were down. Spencer said that the front door then opened and that he saw Officer Bennett with a gun, so he shot him.

Spencer said that he did not know if other officers were in the front of the apartment, so he went toward the back door. He saw Officer Owen's gun on the floor beside him, and he took the gun because he did not want to be shot. He opened the back door and saw Officer Collins standing outside the apartment; Officer Collins took a few steps toward him with his gun in his hand. Spencer testified that he walked out of the apartment and that he and the officer looked eye-to-eye, and that the officer then ran behind his patrol car. Spencer said that he waited until Officer Collins was behind the car and then he fired a couple of shots into the windshield. He said that he could have shot and killed Officer Collins, but that he had no reason to because the officer posed no threat to him. Spencer stated that he then went to the front door and cautiously walked outside, holding the gun at his side, pointing down. While he was standing next to Officer Bennett, Spencer said, the officer's hand "jumped and touched me, you know, and automatically, reflex, you know, I quickly shot." After he shot Officer Bennett at close range, he threw the gun down and ran to a neighbor's house. Spencer testified that he did not intend to kill any of the police officers but that he did what he had to do to avoid being shot and to stay alive. However, on cross-examination, Spencer acknowledged that in a prior statement to the police, he had said that he shot the officers because he was "pissed off."

In addition to Spencer's testimony from his trial, the testimony of Randall Washington, who was declared an unavailable witness, from Spencer's trial was also read into evidence at Woods's trial. Washington testified at Spencer's trial that he was in the backyard of the apartment working underneath Courtney Spencer's car when the police arrived to arrest Woods. He heard someone say, "They're back." While the police were walking toward the apartment, Courtney

Spencer raised his hand and said, " 'I don't have anything to do with this. I'm just over here getting my car worked on,' " and he walked away. Washington said that he stayed under the car because he had an outstanding warrant for his arrest for unpaid fines, and he did not want to be arrested. Washington heard Officer Owen say to someone at the back door that he had a warrant; Officer Owen said this to the person more than once. Washington next saw another officer walk around from the side of the apartment at a fast pace toward the screen door. Washington said that he then heard a snap and saw the police officer snatch open the screen door and enter the apartment. A second officer followed him, Washington said, but he did not see a third officer. Washington testified that, one to three minutes later, he heard gunshots. He stayed beneath the car until the shooting stopped, then he ran away.

In rebuttal, the State recalled Det. Phillip Russell. Det. Russell testified that, when Spencer gave his statement to the police on the afternoon of the shooting, he admitted that he had killed the three officers, but, contrary to his testimony at his trial, he repeatedly denied taking Officer Owen's gun. Det. Russell also testified that Spencer did not say in his statement, as he did at his trial, that he was the one who shot Officer Bennett in the face. Finally, Det. Russell testified that he had asked Spencer where Woods was while Spencer was shooting, and Spencer said, "'Nate had—he was running with me.'"

*Woods v. State*, 13 So. 3d 1, 5-18 (Ala. Crim. App. 2007) (internal citations and footnote omitted).

## II.    PROCEDURAL HISTORY

### A.    Trial

On October 17, 2004, a Jefferson County grand jury indicted Woods for four counts of capital murder for his involvement in the shootings of the four

Birmingham police officers: three counts of capital murder, in violation of Section 13A-5-40(a)(5) of the Code of Alabama (1975), for the deaths of the three officers, and one count of capital murder, in violation of Section 13A-5-40(a)(10), for the murder of two or more persons by one act or pursuant to one scheme or course of conduct. Woods was also charged with one count of attempted murder, in violation of Section 13A-6-4. Attorneys Rita Briles and Cynthia Umstead were appointed as counsel.

Woods's charges were consolidated for trial on the State's motion. The trial began on October 3, 2005. In its case in chief, the State offered the testimony of 39 witnesses, including Michael Collins, 25 other law enforcement officers, and experts in firearms and handwriting. The defense countered with six witnesses, including two inmates and Kerry Spencer. After less than two and a half hours of deliberation on October 10, 2005, the jury found Woods guilty on all counts.

During the penalty phase, the defense presented testimony from four of Woods's relatives and friends—Synthia Sherman, his aunt; Shena Carter, his cousin; Pamela Woods, his mother; and Stephanie Claybion, a friend—and Woods himself spoke. The State called the widows of the three officers. The court charged the jury on four aggravating circumstances: (1) the defendant knowingly created a great risk of death to many persons, (2) the offense was committed for the purpose

of avoiding or preventing a lawful arrest or affecting an escape from custody, (3) the offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement or laws, and (4) the defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct. The last of these aggravating circumstances—the death of two or more persons—was unanimously proven by virtue of the jury's guilt-phase verdict. The jury recommended 10–2 that Woods be sentenced to death on each of the four capital counts.

At the sentencing hearing on December 2, 2005, the State presented testimony from a resident of the area who had been near the gunfire and from Stacy Sellers, Chisholm's widow, who had received a threatening letter from Woods after the trial stating, "I will forgive, but I won't forget." The defense offered testimony from Woods's mother and from a family friend. After hearing the testimony, the court accepted the jury's recommendation and sentenced Woods to death one week later.

Woods filed a motion for new trial on January 3, 2006, which was overruled after a hearing. As Woods's trial counsel did not wish to handle the appeal, the court appointed new counsel in their stead.

**B.     Direct Appeal**

With new counsel on direct appeal, Glennon Threatt, Woods raised five issues: (1) the trial court erred when it admitted testimony from several witnesses about Woods's collateral bad acts, (2) the evidence was insufficient to sustain his conviction as an accomplice pursuant to Ala. Code § 13A-2-23 because there was no evidence indicating that Woods possessed or fired a gun during the shooting, (3) the trial court committed error in several evidentiary rulings during the penalty phase, (4) Woods was denied effective assistance of counsel during the penalty phase, and (5) the jury-verdict-override sentencing scheme of Alabama's capital-murder statute is unconstitutional.

The Alabama Court of Criminal Appeals affirmed Woods's convictions but remanded for an amended sentencing order that would clarify the trial court's findings regarding non-statutory mitigating circumstances. *Woods*, 13 So. 3d at 40. After the trial court issued its amended sentencing order on September 24, 2007, Woods appealed again, and the Alabama Court of Criminal Appeals affirmed his death sentence on return from remand on December 21, 2007. *See id.* at 43.

Woods's direct appeal counsel then moved to withdraw and did not file a petition for writ of certiorari to the Alabama Supreme Court. The certificate of judgment was issued on January 9, 2008. On April 29, 2008, now represented by attorneys from the Equal Justice Initiative, a non-profit organization, Woods filed a

motion for out-of-time appeal in the Alabama Supreme Court, alleging that Woods's direct appeal counsel never discussed further proceedings with him and that he had been prejudiced because he was too late to file a motion for reconsideration in the Alabama Court of Criminal Appeals or a petition for certiorari. The Alabama Supreme Court put the matter on hold until the Alabama Court of Criminal Appeals could consider the issue, and on May 9, 2008, Woods filed a motion to withdraw the certificate of judgment to permit filing of an application for rehearing in the lower court. The Alabama Court of Criminal Appeals denied Woods's motion on October 14, 2008. Once again, Woods pursued an out-of-time appeal in the Alabama Supreme Court, but the court denied his motion on August 24, 2009, noting that Woods's Rule 32 petition was then pending in the circuit court. The United States Supreme Court denied certiorari on February 22, 2010. *Woods v. Alabama*, 559 U.S. 942 (2010).

### C.     Rule 32

Through the Equal Justice Initiative, Woods filed a 124-page, 32-issue petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Jefferson County circuit court on December 30, 2008, while his motion for an out-of-time emergency appeal was still pending in the Alabama Supreme Court. Woods also filed a motion to stay and hold the Rule 32 petition in abeyance pending his

pursuit of an out-of-time appeal, which the circuit court granted on January 14, 2009. On February 10, 2010, attorneys LaJuana Davis and John Carroll entered a notice of appearance, and counsel from the Equal Justice Initiative withdrew on April 1, 2010. The State filed an answer to Woods's Rule 32 petition in July, then an amended answer later that month. The circuit court summarily dismissed the petition on December 1, 2010. Woods filed a motion for reconsideration on December 30, 2010, which the circuit court denied on January 25, 2011. Woods appealed, but the Alabama Court of Criminal Appeals affirmed the dismissal of his Rule 32 petition on April 29, 2016. *Woods v. State*, 221 So. 3d 1125 (2016). The Alabama Supreme Court denied certiorari on September 16, 2016. Woods did not pursue his appeal in the United States Supreme Court.

### D.    Federal Habeas Corpus

Woods filed the instant petition for a writ of habeas corpus on October 27, 2016. The petition is his first federal habeas petition, and it is timely. *See* 28 U.S.C. § 2241(d)(1). He filed an amended habeas petition on February 2, 2017, which the State answered on February 17, 2017. Woods filed a reply brief on March 17, 2017. Woods's counsel, who had represented him in his Rule 32 proceedings as well, moved to withdraw on February 3, 2017. On April 28, 2017, new counsel was appointed by this Court. Woods filed a second amended petition on May 30, 2017,

the State answered again on June 27, 2017, and Woods replied in support thereof on July 27, 2017.

## III.   STANDARDS OF FEDERAL HABEAS REVIEW

This action is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Pursuant to § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court" unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this Court's review of habeas claims is limited to federal constitutional questions. Claims pertaining solely to "an alleged defect in a [state] collateral proceeding" or to a "state's interpretation of its own laws or rules" do not provide a basis for federal habeas corpus relief under § 2254. *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325-26 (11th Cir. 2010) (quotation marks and citations omitted).

### A.   Exhaustion of State Remedies and Procedural Default

Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases where an applicant has exhausted all state remedies. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). This means that "'[s]tate prisoners must

give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's last court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732-33 (1999)). Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of the rule. *Id.* The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (citation omitted)). Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277 (1982)).

"[A]n issue is exhausted if 'the reasonable reader would understand the claim's particular legal basis and specific factual foundation' to be the same as it

was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)) (brackets in original omitted). If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, i.e., "the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). Moreover, a "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594 (1991). Yet as the Eleventh Circuit has noted, a claim will only be procedurally defaulted in the following circumstance:

> [A] state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).
>
> We have "established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and

adequate state rule of decision." *Judd*, 250 F.3d at 1313. "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id.* Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *See id.* Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion." *Id.*

*Ward*, 592 F.3d at 1156–57 (footnote omitted).

There are also instances where the doctrines of procedural default and exhaustion intertwine. For instance, if a petitioner's federal claim is unexhausted, a district court will traditionally dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519-20, 102 S. Ct. 1198, 1204 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citation omitted).

## B.    Overcoming Procedural Default

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure

to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749–50, 111 S. Ct. 2546, 2564-65 (1991) (citations and internal quotation marks omitted).

The "cause and prejudice" exception is framed in the conjunctive, and a petitioner must prove both cause and prejudice. *Id.* at 750, 111 S. Ct. at 2565. To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986). Examples of such objective factors include:

> . . . interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally ineffective assistance of counsel . . . is cause. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 494, 111 S. Ct. 1454, 1470 (1991) (internal quotation marks, brackets, and citations omitted). As for prejudice, a habeas petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596 (1982) (emphasis in original).

Finally, a petitioner may also escape a procedural default bar if he "can demonstrate a sufficient probability that [the court's] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591 (2000). To make such a showing, a petitioner must establish that either: (1) "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537, 106 S. Ct. 2661, 2668 (1986) (quoting *Carrier*, 477 U.S. at 496, 106 S. Ct. at 2650), or (2) the petitioner shows "by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323, 115 S. Ct. 851, 865 (1995) (emphasis in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S. Ct. 2514, 2517 (1992)).

## C.  AEDPA Review of State Court Decisions Under § 2254(d) and (e)

When a constitutional claim upon which a petitioner seeks relief under § 2254 is not procedurally defaulted but has instead been adjudicated on the merits in state courts, this Court is still restricted in its ability to grant relief on those claims by § 2254(d). The AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks and citation

omitted). To grant habeas relief on a claim, this Court must not only find that the constitutional claims are meritorious, but also that the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting § 2254(d)). The burden of showing that an issue falls within § 2254(d)(1) or (d)(2) is upon the petitioner. *See Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S. Ct. 357, 360 (2002). Section 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses have independent meanings. *See Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) ("[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis.") (citation omitted). A state court's decision is contrary to "clearly established precedents [of the Supreme Court of the United States] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438

(2005) (citation omitted). On the other hand, to determine whether a state court's decision is an "unreasonable application" of clearly established federal law, the Supreme Court has stated:

> The pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable . . . For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself.

> A state court's determination that a claim lacks merits precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. And as the [Supreme Court] has explained, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785-86 (2011) (citation and quotation marks omitted) (emphasis in original); *see also Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Guzman*, 663 F.3d at 1346 ("Ultimately, before a federal court may grant habeas relief under § 2254(d), 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any

possibility for fairminded disagreement.'") (quoting *Harrington*, 131 S. Ct. at 786-87). As the Supreme Court has stated, "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102, 131 S. Ct. at 786.

Moreover, a state court's factual determination is entitled to a presumption of correctness under § 2254(e)(1)). And commensurate with the deference accorded to a state court's factual findings, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward,* 592 F.3d at 1155-56 (alterations in original) (quoting § 2254(e)(1)).

### D.     The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Additionally, because habeas corpus review is limited to review of errors of constitutional dimension, a habeas corpus petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S. 849, 856, 114 S. Ct. 2568, 2572 (1994) (citation omitted). "[T]he petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Mayle v. Felix*, 545 U.S. 644, 655, 125 S. Ct. 2562, 2570 (2005) (quoting Rule 2(c) of the Rules Governing § 2254 Cases in the U.S.

District Courts). The burden of proof is on the habeas petitioner "to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) (citation omitted); *see also Smith v. Wainwright*, 777 F.2d 609, 616 (11th Cir. 1985) (holding that a general allegation of ineffective assistance of counsel is insufficient; a petition must allege specific errors in counsel's performance and facts showing prejudice).

### E. The General Standard for Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court established the following two-pronged standard for judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial or on direct appeal:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S. Ct. at 2064 .

Because *Strickland*'s preceding two-part test is clearly framed in the conjunctive, a petitioner bears the burden of proving both "deficient performance" and "prejudice" by "a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); *see also Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, [ ] or vice versa."). Further, when assessing ineffective assistance of counsel claims:

> [I]t is important to keep in mind that in addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference—this one to a State court's decision—when we are considering whether to grant federal habeas relief from a State court's decision. Thus, [a petitioner] not only has to satisfy the elements of the *Strickland* standard, but he must also show that the State court applied *Strickland* to the facts of his case in an *objectively unreasonable manner*.

*Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (brackets in original omitted) (citations and quotation marks omitted) (emphasis in original).

In order to establish deficient performance, a habeas petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064. That reasonableness is judged against "prevailing professional norms." *Id.*, 104 S. Ct. at 2065. Moreover, under *Strickland*, lower federal courts must be "highly deferential" in their scrutiny of

counsel's performance. *Id.* at 689, 104 S. Ct. at 2065. As the *Strickland* Court outlined:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.*, 104 S. Ct. at 2065 (citations and quotation marks omitted).

Simply put, a habeas petitioner "must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Chandler*, 218 F.3d at 1315. The reasonableness of counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and in light of all the circumstances. *See, e.g.*, *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) ("We review counsel's performance 'from

counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).

To satisfy the prejudice prong, a habeas petition "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (citations and quotation marks omitted). Further, the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067. Therefore, "when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069).

Because *Strickland* and § 2254(d) both mandate standards that are "'highly deferential'", "when the two apply in tandem, review is 'doubly' so." *Harrington*,

131 S. Ct. at 788 (citations omitted). The inquiry is not then "whether counsel's actions were reasonable," but is instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The court must determine "whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 785. This "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012).

Finally, "[s]tate court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

### 1. The *Martinez v. Ryan* Rule

In *Martinez v. Ryan*, the Supreme Court announced a "narrow exception" to the procedural default rule of *Coleman*, 501 U.S. at 755, 111 S. Ct. at 2546, in the limited circumstances where a state law "requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding." 566 U.S. 1, 9, 14, 132

S. Ct. 1309, 1315, 1319 (2012). The exception applies only when four conditions are met:

> (1) a state requires a prisoner to raise ineffective-trial-counsel claims at the initial-review stage of a state collateral proceeding and precludes those claims during direct appeal; (2) the prisoner did not comply with state rules and failed properly to raise ineffective-trial-counsel claims in his state initial-review collateral proceeding; (3) the prisoner did not have counsel (or his appointed counsel was ineffective by not raising ineffective-trial-counsel claims) in that initial-review collateral proceeding; and (4) failing to excuse the prisoner's procedural default would cause the prisoner to lose a "substantial" ineffective-trial-counsel claim.

*Arthur v. Thomas*, 739 F.3d 611, 629 (11th Cir. 2014) (citing *Martinez*, 566 U.S. at 14, 132 S. Ct. at 1319). A following case, *Trevino v. Thaler*, 569 U.S. 413, 429, 133 S. Ct. 1911, 1921 (2013), extended the *Martinez* rule to state systems in which it was "virtually impossible" for ineffective assistance claims to be raised on direct appeal.

In other words, to prevail under *Martinez*, a petitioner must demonstrate that his trial counsel were ineffective under *Strickland* in their treatment of a particular issue and that his initial-review collateral appeal counsel were also ineffective under *Strickland* for failing to raise a claim of ineffective assistance of trial counsel concerning that issue. As the Eleventh Circuit has explained, the petitioner must show "more than the mere fact [collateral counsel] failed to raise potentially meritorious claims; he must show that no competent counsel, in the

exercise of reasonable professional judgment, would have omitted those claims."

*Hittson v. GDCP Warden*, 759 F.3d 1210, 1263 (11th Cir. 2014). In this limited case,

"a procedural default will not bar a federal habeas court from hearing a substantial

claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 17, 132 S. Ct. at 1320.

The *Martinez* rule applies only in initial-review collateral proceedings; it

"does not concern attorney errors in other kinds of proceedings, including appeals

from initial-review collateral proceedings, second or successive collateral

proceedings, and petitions for discretionary review in a State's appellate courts."

*Id.* The Eleventh Circuit has held that *Martinez* does not serve as a vehicle to allege

a freestanding claim of ineffective assistance of state post-conviction counsel.

*Lambrix v. Sec'y, Fla. Dept. of Corrs.*, 756 F.3d 1246, 1262-63 (11th Cir. 2014), *see*

*also* 28 U.S.C. § 2261(e) ("The ineffectiveness or incompetence of counsel during

State or Federal post-conviction proceedings in a capital case shall not be a ground

for relief in a proceeding arising under section 2254.").

## IV.  DISCUSSION OF WOODS'S CLAIMS

### A.  Woods's claim that he was denied the rights to due process and equal protection when his direct appeal counsel failed to petition for rehearing or file a petition for certiorari

Woods argues that because his direct appeal counsel failed to file an

application for rehearing in the Alabama Court of Criminal Appeals or a petition for

certiorari in the Alabama Supreme Court, he was prejudiced and should have been permitted to file further direct appeals out of time.

This claim is exhausted because Woods raised it during his direct appeal proceedings when he filed the motion for an out-of-time appeal in the Alabama Supreme Court and again on all levels of his Rule 32 proceedings. On appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals held that the circuit court had been correct that the claim was both precluded under Rule 32.2(a) of the Alabama Rules of Criminal Procedure because it had already been raised and rejected and also held that the circuit court correctly rejected it on its merits. *Woods*, 221 So. 3d at 1144-47. Accordingly, this Court conducts the deferential AEDPA review of the state courts' decision pursuant to 28 U.S.C. § 2254(d).

As the Alabama Court of Criminal Appeals explained, this claim is meritless. A defendant is constitutionally entitled to counsel on his first direct appeal. *See Douglas v. California*, 372 U.S. 353, 357-58, 83 S. Ct. 814, 816-17 (1963) (holding that a state may not deny an indigent defendant the assistance of counsel in the defendant's first appeal which is granted by the state as a matter of right); *Penson v. Ohio*, 488 U.S. 75, 81-82, 109 S. Ct. 346, 350-51 (1988); *Jenkins v. State*, 972 So. 2d 111, 125–26 (Ala. Crim. App. 2004), *rev'd in part on other grounds*, *Ex parte Jenkins*,

972 So. 2d 159 (Ala. 2005). However, the United States Supreme Court has held that there is no right to counsel to pursue application for review by the United States Supreme Court or discretionary state appeals, *see Evitts v. Lucey*, 469 U.S. 387, 394, 105 S. Ct. 830, 834-35 (1985); *Wainwright v. Torna*, 455 U.S. 586, 587, 102 S. Ct. 1300, 1301 (1982); *Ross v. Moffitt*, 417 U.S. 600, 615–16, 94 S. Ct. 2437, 2446 (1974), which includes applications for rehearing and certiorari review in Alabama, even in capital cases. *See Birdsong v. State*, 929 So. 2d 1027, 1028 (Ala. Crim. App. 2005) (no right to counsel in an application for certiorari review to the Alabama Supreme Court); *Kinsey v. State*, 545 So. 2d 200, 203–04 (Ala. Crim. App. 1989) (no right to counsel in applications for rehearing to the Alabama Court of Criminal Appeals); *Thomas v. State*, 511 So. 2d 248, 258 (Ala. Crim. App. 1987) (applying rule to death penalty cases); Ala. R. App. P. 39(a).[1] Thus, the fact that Woods's counsel failed to file applications for discretionary appeals does not excuse Woods's own failure to do so. Where there is no right to counsel, the appellant must bear the burden of counsel's actions. *See Evitts*, 469 U.S. at 396 n.7, 105 S. Ct. at 836 n.7 ("the right to effective assistance of counsel is dependent on the right to counsel itself").

---

[1]     While *Kinsey* and other pre-2000 decisions stated that Ala. R. App. P. 39 granted death-sentenced appellants certiorari review as a matter of right, the 2000 amendment to Rule 39 removed this provision. Ala. R. App. P. 39(a) cmt. of May 19, 2000.

Moreover, contrary to Woods's assertion, there is nothing in the Eighth or Fourteenth Amendments that requires the Alabama Supreme Court to grant certiorari review in death penalty cases, particularly in a case such as Woods's, where the would-be petitioner failed to make a timely filing. Woods can point to no United States Supreme Court decision, statute, or rule mandating that an inmate sentenced to death must be granted certiorari review by a state supreme court.

Relatedly, as Woods was not entitled to counsel in proceedings following the Alabama Court of Criminal Appeals' decision on his first direct appeal, he could not have suffered *Strickland* prejudice. The cases upon which Woods relies, *see, e.g., Roe v. Flores-Ortega*, 528 U.S. 470, 120 S. Ct. 1029 (2000), concern direct appeals, not subsequent discretionary appeals, and are therefore inapposite here.

As this claim is meritless, the state courts' decisions were neither contrary to or involved an unreasonable application of clearly established Federal law, nor an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). This claim is due to be dismissed.

## B. Woods's claim that his direct appeal counsel was constitutionally ineffective for failing to appeal his attempted murder conviction

Woods argues that because his direct appeal counsel failed to appeal his attempted murder conviction specifically, he was denied his right to effective

assistance of counsel and he should have been permitted to file further direct appeals out of time.

This claim has not been exhausted because while Woods raised it in his Rule 32 proceedings in the circuit court and the Alabama Court of Criminal Appeals, he failed to raise it in his petition for certiorari in the Alabama Supreme Court. *See Pruitt*, 348 F.3d at 1359 (citing *O'Sullivan*, 526 U.S. at 845, 119 S. Ct. at 1732-33). Dismissal of his habeas petition to allow Woods to present this claim fairly as a federal claim in state court now would be futile because it is too late for him to return to state court to exhaust the claim by petitioning the Alabama Supreme Court for certiorari. *See Bailey*, 172 F.3d at 1305. Thus, because any state remedy with respect to this claim is procedurally barred by the state procedural rules noted above, Woods's claim is procedurally defaulted from habeas review.

Assuming solely for argument that the claim was not barred, it fails on the merits. It is unclear what relief Woods could hope to gain from an appeal of his non-capital conviction. As the circuit court discussed in dismissing a related claim:

> It is also important to note that Woods's four capital convictions (which were appealed) and his attempted murder conviction all stemmed from the same occurrence—the shootings of four Birmingham police officers. There was absolutely no evidence in this case (nor does Woods even allege) that the capital murders and the attempted murder were separate and distinct crimes. Rather, the four capital murders and the attempted murder were all committed as part of a single course of conduct. Further, on appeal from Woods's capital

convictions and sentences of death, the Alabama Court of Criminal Appeals scrupulously searched the record for any error that adversely affected Woods's substantial rights and failed to find any.

Vol. 30, Tab #R-62, at C 41-42. Therefore, this claim is due to be dismissed.

### C. Woods's claim that the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972)

Woods contends that the State violated its obligations under *Brady v. Maryland* and *Giglio v. United States* because it failed to disclose that two State witnesses, Fernando Belser and Marquita McClure, were allegedly threatened or induced into giving testimony favorable to the State, plus other unspecified "exculpatory and impeachment evidence."

Woods raised this claim for the first time in his Rule 32 petition. The circuit court dismissed it for three reasons: it was precluded by Rules 32.2(a)(3) and (a)(5) of the Alabama Rules of Criminal Procedure because it could have been raised at trial or on direct appeal, but was not; it was insufficiently pleaded under Rule 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure; and it was facially meritless. While Woods raised this claim in the Alabama Court of Criminal Appeals on appeal from the denial of his Rule 32 petition, that court failed to fully address the issue. Thus, the circuit court is the last court to have given a reasoned denial of the claim. *See Ylst*, 501 U.S. at 804, 111 S. Ct. at 2594 ("Where there has

been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

First, the circuit court found that the claim was precluded by Rules 32.2(a)(3) and (a)(5) because it could have been raised at trial or on direct appeal, but was not. The Alabama Court of Criminal Appeals has held that a *Brady* claim raised on Rule 32 review is precluded unless it concerns newly discovered evidence or evidence that was allegedly suppressed until such time as the evidence could not be presented at trial. *Boyd v. State*, 913 So. 2d 1113, 1142 (Ala. Crim. App. 2003). The circuit court found that Woods did not base his *Brady* claim on newly discovered evidence or evidence that was allegedly suppressed until such time as the evidence could not be presented at trial. In this circuit, claims barred under Rules 32.2(a)(3) and (a)(5) are procedurally defaulted from habeas review. *Boyd v. Comm'r, Ala. Dep't of Corrs.*, 697 F.3d 1320, 1335 (11th Cir. 2012). Accordingly, Woods is due no relief.

As noted, the circuit court also found that the claim was insufficiently pleaded under Rules 32.3 and 32.6(b) based on Woods's failure to plead facts sufficient to satisfy the five-part test in Rule 32.1(e) for newly discovered evidence and that it was facially meritless. A Rule 32 dismissal for lack of specificity is a

merits ruling in this circuit. *Borden v. Allen*, 646 F.3d 785, 812-13 (11th Cir. 2011). As such, this Court conducts the deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d). The circuit court's decision was not contrary to, nor did it involve an unreasonable application of, *Brady*, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. As explained by the Eleventh Circuit:

> A *Brady* violation has three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Evidence is not considered to have been suppressed if "the evidence itself . . . proves that [the petitioner] was aware of the existence of that evidence before trial." *Felker v. Thomas*, 52 F.3d 907, 910 (11th Cir. 1995). The prejudice or materiality requirement is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Materiality is determined by asking whether the government's evidentiary suppression undermines confidence in the guilty verdict. *See Kyles*, 514 U.S. at 434, 436–37 & n. 10, 115 S. Ct. 1555.

*Boyd*, 697 F.3d at 1334-35. Woods failed to plead exactly what information was withheld or how it was material to the defense, relying instead on vague assertions that the witnesses were "threatened or offered inducements." Moreover, the State told the trial court that it "intends to provide the defendant with open file

discovery and items within its possession, custody and control." Vol. 1 at C. 140. Accordingly, Woods has not established that he is entitled to relief pursuant to 28 U.S.C. § 2254(d).

>    **D. Woods's claim that evidence of prior bad acts was erroneously admitted in violation of his rights to due process, a fair trial, and a reliable sentence under the Sixth, Eighth, and Fourteenth Amendments**

Woods raises five sub-issues within this claim: (a) the trial court improperly admitted a misdemeanor domestic violence warrant for Woods and the fact that police officers located him in the "city files" that exist "if you have been arrested;" (b) the court improperly admitted evidence of his contemporaneous drug sales and gun use; (c) the court improperly admitted evidence of his conduct toward police officers on other occasions, such as the instance when he was stopped by police for looking suspicious and he told Fairfield officer Greg Parker that he "could have" shot him and the instance when he allegedly said to Deputy Powell at the county jail that Powell was "hiding behind [his] badge just like the three other mother fuckers; and that if he wins his case, he was going to come look for [Powell];" (d) the court improperly admitted items found in Woods's jail cell, including the violent drawings and rap lyrics; and (e) the court's limiting instructions were inadequate.

Woods raised this entire claim for the first time in his Rule 32 proceedings, but he did not raise it on appeal from the Rule 32 denial in the Alabama Court of Criminal Appeals or in his petition for certiorari to the Alabama Supreme Court.[2] The claim has thus not been exhausted and is not properly before this Court. Dismissal of his habeas petition to allow Woods to present this claim fairly as a federal claim in state court now would be futile because it is too late for him to return to state court to exhaust the claim by appealing and/or petitioning the Alabama Supreme Court for certiorari. *Bailey*, 172 F.3d at 1305. Thus, because any state remedy with respect to this claim is procedurally barred by the state procedural rules noted above, Woods's claim is procedurally defaulted from habeas review.

In the alternative, the circuit court correctly determined that much of this claim was precluded by Rule 32.2(a) of the Alabama Rules of Criminal Procedure because the sub-claims were either not raised at trial or on direct appeal or had been raised and rejected on direct appeal. Sub-claim (a) was barred by Rules

---

[2]    This claim alleges that the trial court erred in admitting evidence. At the end of his Rule 32 petition, Woods included subparts (a), (c), and (e) in his insufficiently-pleaded-ineffective assistance-of-counsel claim. *See* Vol. 31, Tab #R-64, at 116. While Woods did allege ineffective assistance of counsel before the Alabama Court of Criminal Appeals on appeal from the Rule 32 denial, he did not raise the specific claim at issue here. As such, the same claim was not raised below and thus has not been exhausted. *See Pope*, 680 F.3d at 1286 ("[A]n issue is exhausted if the reasonable reader would understand the claim's particular legal basis and specific factual foundation to be the same as it was presented in state court.") (quotation marks and citation omitted).

32.2(a)(3) and (a)(5) because the claim could have been raised at trial or on direct appeal but was not, and Woods's contention concerning the admission of the evidence that officers located him in the "city files" was precluded by Rule 32.2(a)(4) because it was raised and rejected on direct appeal. Similarly, sub-claim (c) was also barred by Rules 32.2(a)(3) and (a)(5). Sub-claims (b) and (d) were barred by Rule 32.2(a)(4). While the court did not specifically address sub-claim (e), the claim concerning the limiting instruction, that, too, could have been raised at trial or on direct appeal, and it was properly barred by Rules 32.2(a)(3) and (a)(5).

Again, the Eleventh Circuit has "squarely held" that claims barred by Rules 32.2(a)(3) and (a)(5) are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, and therefore, Woods is due no relief on sub-claims (a) and (c).

As for sub-claims (b) and (d), the Eleventh Circuit has held that preclusion due to Rule 32.2(a)(4) is not a bar to habeas review. *Williams v. Alabama*, 791 F.3d 1267, 1274–76 (11th Cir. 2015) ("Federal courts have long recognized that a state court's refusal to re-address the merits of a claim, on the grounds that the claim has already been given full consideration in some previous proceeding, imposes no barrier to federal review. Instead, this type of state-court decision provides strong evidence that the claim has already been given full consideration by the state courts

and thus is *ripe* for federal adjudication.") (internal citations and quotation marks omitted). As such, if this claim was not procedurally barred, this Court's task would be to review the state court's adjudication of these portions of the claim pursuant to 28 U.S.C. § 2254(d).

Conducting that review, Woods has not established that the Alabama Court of Criminal Appeals' decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. In a detailed analysis, the Alabama Court of Criminal Appeals held on direct appeal that the admission of the testimony regarding the "city files" was not plain error because this testimony was not offered as improper character evidence under Federal Rule of Evidence 404(b) but rather as part of the witness's explanation of the steps taken to gain information about Woods. *Woods*, 13 So. 3d at 18-20. The court then held that the admission of the evidence of Woods's drug sales and gun use was not plain error because counsel for both sides gave details about Woods's and Spencer's drug operation during their opening statements. *Id.* at 18-23. As for the items taken from Woods's cell, the court held that they were properly admitted "as relevant evidence of Woods's post-crime conduct" and "as an indication of his

consciousness of guilt." *Id.* at 18-26. Although Woods cites *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S. Ct. 2597, 2608 (1991) (considering specifically victim-impact evidence at the penalty phase of a trial and noting, "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief"), he has not demonstrated that the admission of the aforementioned evidence rendered his trial fundamentally unfair. These portions of this claim are due to be denied.

E.   **Woods's claim that the venue of the trial should have been changed due to extensive publicity**

Woods argues that the court's refusal to order a change of venue for the trial violated his rights to due process, a fair trial, an impartial jury, and a reliable sentencing protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise it in the Alabama Court of Criminal Appeals[3] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

---

[3]      While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

In the alternative, the circuit court correctly dismissed it for two reasons. First, the claim could have been raised at trial or on direct appeal but was not, and so it was barred by Alabama Rules of Criminal Procedure 32.2(a)(3) and (a)(5). As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Second, the circuit court correctly found that the claim was insufficiently pleaded under Rules 32.3 and 32.6(b), as Woods failed to plead specific facts showing either that the community was saturated with prejudicial publicity so as to create a presumption of prejudice or that his jury was actually prejudiced. Because a Rule 32 dismissal for lack of specificity is a merits ruling in this circuit, *see Borden*, 646 F.3d at 812-13, if the claim was not otherwise barred, this Court would conduct the deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d).

The circuit court's determination was neither contrary to nor an unreasonable application of clearly established Federal law, nor an unreasonable determination of the facts, and Woods is not entitled to relief. The clearly established Federal law on this issue is found in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507 (1966), *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417 (1963), and *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639 (1961). In analyzing whether a

defendant's trial was deprived of fundamental fairness by pretrial publicity or an inflamed community atmosphere, courts consider both an "actual prejudice" standard and a "presumed prejudice" standard. *See Coleman v. Zant*, 708 F.2d 541, 544 (11th Cir. 1983) (citing *Irvin, Sheppard, Rideau*, *supra*). Woods's invocation of the Supreme Court's landmark cases on prejudicial pretrial publicity falls short, as it was not unreasonable for the circuit court to conclude that the evidence of trial publicity in this case did not rise to the level of the "carnival atmosphere" discussed in *Sheppard*, 384 U.S. at 354, 86 S. Ct. at 1518 ("For months the virulent publicity about Sheppard and the murder had made the case notorious. Charges and countercharges were aired in the news media besides those for which Sheppard was called to trial. In addition, only three months before trial, Sheppard was examined for more than five hours without counsel during a three-day inquest which ended in a public brawl. The inquest was televised live from a high school gymnasium seating hundreds of people."); *Rideau*, 373 U.S. at 725-27, 83 S. Ct. at 1418-20 (describing as a "spectacle" the fact that "[w]hat the people of Calcasieu Parish saw on their television sets was Rideau [the defendant], in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff" and thus deciding not to examine the voir dire for actual prejudice because

the trial was but a "hollow formality"); or *Irvin*, 366 U.S. at 727, 81 S. Ct. at 1645 ("An examination of the 2,783–page voir dire record shows that 370 prospective jurors or almost 90% of those examined on point . . . entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty . . . . A number admitted that, if they were in the accused's place in the dock and he in theirs on the jury with their opinions, they would not want him on the jury. . . . [O]f the voir dire examination of a majority of the jurors finally placed in the jury box[,] [e]ight out of the 12 thought petitioner was guilty.").

Nor was the circuit court's decision based on an unreasonable determination of the facts in light of the evidence presented. In support of his argument that presumed prejudice existed, Woods argues that the fact that *The Birmingham News* alone had published over 100 articles on the case, that his co-defendant Kerry Spencer's trial was first so the jury pool in Jefferson County had already been exposed to the fact that Spencer had been convicted and sentenced to death through publicity about that trial, and that the news coverage included "sharp criticism of jurors who had had voted for a sentence of life imprisonment without parole and the opinion of many members of the community, contrary to Alabama law, that death was the appropriate sentence whenever law enforcement officers are killed" should have demonstrated to the circuit court that an overwhelming

number of prospective jurors believed Woods to be guilty before they were even empaneled. With regard to the media coverage, the Eleventh Circuit has stated, "The fact that a case generates widespread publicity does not, in and of itself, warrant a change of venue." *Baldwin v. Johnson*, 152 F.3d 1304, 1314 (11th Cir. 1998). Indeed, "the principle of presumed prejudice 'is rarely applicable and reserved for extreme situations.'" *Mills v. Singletary*, 63 F.3d 999, 1010 (11th Cir. 1995) (citation omitted). The Supreme Court has explained that in each of its cases where it overturned a conviction due to a presumption of prejudice from pretrial publicity, those "'conviction[s] [had been] obtained in a trial atmosphere that was utterly corrupted by press coverage.'" *Skilling v. United States*, 561 U.S. 358, 380, 130 S. Ct. 2896, 2914 (2010) (citation omitted) (alteration in original omitted). The Court reiterated that those decisions, however, "'cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.'" *Id.* (citation omitted); *see also Murphy*, 421 U.S. at 800 n.4, 95 S. Ct. at 2036 n.4 (distinguishing "largely factual publicity from that which is invidious or inflammatory," and noting that "[t]o ignore the real differences in the potential for prejudice would not advance the cause of fundamental fairness, but only make impossible the timely prosecution of persons who are well known in the community . . . ."). *See Gaskin v. Sec'y, Dept.*

*of Corr.,* 494 F.3d 997, 1005 (11th Cir. 2007) (no habeas error in denial of petitioner's motion for change of venue, even though articles published in local paper "may have been somewhat prejudicial or inflammatory").

Woods also contends that prejudice can be presumed from the fact that the trial court knew in advance that large numbers of uniformed police officers were going to attend the trial, and that they did in fact attend the trial, thus creating a risk that jurors would be intimidated. Woods relies upon *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S. Ct. 1340, 1346 (1986), in which the Supreme Court stated in dicta, "We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial." Woods also relies upon *Woods v. Dugger*, 923 F.2d 1454 (11th Cir. 1991), where the Eleventh Circuit applied that dicta to a case in which a habeas petitioner convicted of murdering a correctional officer alleged that he was deprived of a fair trial by the presence of uniformed correctional officers in the courtroom. However, *Woods* is easily distinguishable. The crime had occurred in a small, rural community in which the prison where the murder occurred provided employment for a significant proportion of the population. Just prior to the murder, the correctional officer had spoken publicly about understaffing at the prison, stating that he feared for his life. *Id*. at 1458. In addition to overwhelming media coverage of the case, the officer's

family had circulated a petition signed by five thousand individuals calling for the death penalty for murders committed by incarcerated persons. *Id*. Forty-five uniformed prison guards sat in the courtroom during significant portions of the trial for no reason other than to observe the proceedings. The Eleventh Circuit, describing the case before it as "extreme," held that in light of all the circumstances, the guards' presence at trial sent an unmistakable message that the defendant was guilty and deserved death as punishment. *Id*. at 1459–60. The court found that, as a result, the petitioner had been denied a fair trial. *Id*. at 1460. In sharp contrast here, Woods was tried in Birmingham, the most populous city in Alabama, with potential jurors drawn from Jefferson County, the most populous county, and there is no reason to believe that anything resembling the facts that led to a finding of inherent prejudice in *Woods* was present in this case.

The Court also finds that the circuit court's conclusion that no actual prejudice existed was not unreasonable in light of the evidence before the state courts. Woods asserts that virtually every prospective juror stated that he or she had heard about the case in the news. (R. 165.) He points out that the State recognized the "extensive pretrial publicity" and the "tremendous amount of past publicity" in this case, particularly surrounding the Spencer trial, in its motion to sequester the jury. (C. 308–09.) He further points to the trial court's statement

during voir dire that "You'd have to be living on another planet not to think there might not be some culpability." (R. 375.) He also states that four jurors indicated that they had formed a fixed opinion regarding Woods's guilt based on the media coverage, that most jurors were not questioned individually as to whether they could set aside preconceived notions, and he asserts generally that even for those who were, their conclusory assertions that they could lay aside their opinions were insufficient. (R. 165-66.) However, the Supreme Court has noted,

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective jurors' impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 723, 81 S. Ct. at 1642-43; *see also Murphy*, 421 U.S. at 799-800, 95 S. Ct. at 2036 ("Qualified jurors need not [ ] be totally ignorant of the facts and issued involved.").

Accordingly, even if this claim was not procedurally defaulted, habeas relief is unavailable with regard to this claim because the circuit court's treatment of the change of venue issue is not contrary to, or an unreasonable application of, Supreme Court precedent; nor was it an unreasonable determination of the facts based on the evidence before it.

**F.** **Woods's claim that the trial court did not adequately define "specific intent" in the jury instructions**

Woods argues that the court's jury instruction regarding specific intent violated his due process rights. In charging Woods with capital murder, the State, relying on a theory of complicity, alleged that Woods intentionally caused the deaths of Officers Bennett, Chisolm, and Owen with a firearm while the officers were on duty and that Woods acted with specific intent to bring about the deaths of the three officers pursuant to one scheme or course of conduct. Essential to the State's theory of capital murder was that Woods and Spencer devised a plan to ambush the officers, in which Woods would lure the officers into the residence, thus allowing Spencer to open fire upon them at close range. Especially because there was no concrete evidence that Woods actually fired a shot, for the jury to convict, the State had to prove that Woods intended for Spencer to kill the officers. During deliberations, when the jury requested that the trial court reinstruct them on complicity, and when one juror asked that the trial court repeat his explanation of specific intent in the complicity charge, the trial court told the jury they need only find a "common purpose to commit murder." (R. 1785.)

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[4] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it pursuant to Rules 32.2(a)(3) and (a)(5) because it could have been raised at trial or on direct appeal, but was not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Assuming solely for argument that the claim is not barred, the evidence of Woods's guilt was overwhelming, and he has simply not made the requisite showing that the instruction on specific intent "so infected the entire trial that the resulting conviction violate[d] due process." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S. Ct. 475, 482 (1991) (holding that a jury instruction allegedly incorrect under state law is not a basis for habeas relief).

### G. Woods's claim that the State's closing argument shifted the burden of proof to the defense in violation of his constitutional right to a fair trial

---

[4] While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

Woods argues that because the State was not able to establish who shot Officer Bennett in the face, it relied upon its own lack of evidence to argue that Woods was responsible for that act. Woods specifically takes issue with the prosecutor's statement during closing arguments, as follows:

> There is one question that remains. There's not been one witness who has not been able to tell us who shot Bennet when he was lying on the ground crying out to God for help. Who shot him in the face? Who put that SKS up to him two inches away from his face? No one saw that. We know Kerry Spencer shot him through the screen door as he was standing in the walkway. But we know from Blue that he was screaming on the ground for help. He was silenced but there has not been a witness who can tell us who fired that shot into his face that went through his head. Is that why he says when he gets to John Prather's house "we shot their asses?" If you find that this defendant was merely present and just happened to be at the wrong place at the wrong time, it is your duty to cut him loose. But if you find that he had the intention that these officers be slaughtered and that he did something to aid and abet or help Kerry Spencer slaughter these officers, then find him guilty.

(R. 1679-80.) Woods argues that the State was inviting the jury to rely on a lack of evidence to find guilt, and that this impermissibly shifted the burden of proof to the defense by suggesting to the jury that Woods had an affirmative obligation to present evidence showing that he was not responsible for shooting Officer Bennett in the face.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[5] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it for two reasons. First, pursuant to Rules 32.2(a)(3) and (a)(5), it could have been raised at trial or on direct appeal, but was not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

The circuit court also held that the claim was facially meritless pursuant to Rule 32.7(d), as "Woods . . . failed to show, and the record does not indicate, that the challenged argument was improper, much less that it so infected the trial with unfairness as to make the resulting conviction a denial of due process." Vol. 30, Tab #R-62, at C. 55. Assuming the claim was not barred from review, Woods has not shown that the circuit court's determination was contrary to or an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts under 28 U.S.C. § 2254(d). The clearly established Federal law on this issue is found in *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.

---

[5]     While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

Ct. 2464, 2471 (1986) ("The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.") (quotation marks and citation omitted). The circuit court cited and applied this law reasonably. In *Darden*, the prosecutor in closing argument implied that the death penalty would be the only guarantee against a similar crime being committed; incorporated the defense's description of the perpetrator of the crime as an "animal"; and he made several offensive comments such as wishing the victim "had had a shotgun in his hand when he walked in the back door and blown his [Darden's] face off" and stating, "I wish that I could see him [Darden] sitting here with no face, blown away by a shotgun." 477 U.S. at 179, 180 & n.12, 106 S. Ct. at 2471 & n.12 (internal quotation mark omitted). The Supreme Court nonetheless found that the prosecutor's closing did not deprive the petitioner of a fair trial because the prosecutor did not misstate the evidence or implicate the constitutional rights of the defendant (such as the right to remain silent). *Id.* at 182-83, 106 S. Ct. at 2472. The prosecutor's comments in this case were far less egregious than what was said by the prosecutor in *Darden*, and there is simply no implication that Woods must prove his innocence with affirmative evidence. Woods is not entitled to relief on this claim.

**H.** **Woods's claim that trial court failed to instruct the jury on manslaughter in violation of his rights to due process and a fair trial**

According to Woods, because the State failed to present evidence of an actual agreement between Woods and Spencer to attack the officers, the jury could have rationally found that, although Woods attempted to provoke the officers into entering the residence, he was at most reckless with respect to what harm might come to the them upon entry. Thus, Woods argues, the court should have instructed the jury on manslaughter pursuant to Ala. Code § 13A-6-3(a)(1) as well as capital murder.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[6] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it for two reasons. First, pursuant to Rules 32.2(a)(3) and (a)(5), Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

---

[6] While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

Second, the circuit court correctly found that the claim was insufficiently pleaded under Rules 32.3 and 32.6(b). Recognizing that "[a] jury charge on a lesser included offense should be given when there is a reasonable theory from the evidence to support it," *Roberts v. State*, 735 So.2d 1244, 1252 (Ala. Crim. App. 1997), the circuit court found that Woods failed to plead specific facts showing that he was entitled to the manslaughter instruction and that the failure to give it was reversible error. Because a Rule 32 dismissal for lack of specificity is a merits ruling in this circuit, *see Borden*, 646 F.3d at 812-13, if the claim was not otherwise barred, this Court would conduct the deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d).

If the claim was not otherwise barred from review, the Court notes that the circuit court's determination was neither contrary to nor an unreasonable application of clearly established Federal law, nor an unreasonable determination of the facts, and Woods is not entitled to relief. The circuit court cited the clearly established Federal law on point: *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382 (1980). In *Beck*, the Supreme Court held that Alabama was constitutionally prohibited from absolutely barring a jury in a capital case from considering a lesser-included offense to that of capital murder. 447 U.S. at 638, 100 S. Ct. at 2390. The Court explained that "when the evidence unquestionably establishes that the

defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—" the failure to provide the jury with another option of a lesser-included offense leads to the intolerable risk of an unwarranted conviction for a capital crime. *Id.* at 637, 100 S. Ct. at 1289. Here, Woods cites several pieces of evidence in support of his claim that the jury could have reasonably convicted him of manslaughter. For example, he points out that Fernando Belser testified that it was *his* responsibility to control who entered the apartment where the crimes occurred and established that Woods was startled and scared when Spencer opened fire, and that Officer Collins testified for the State that Officer Chisolm entered the house unexpectedly. Yet this Court cannot say that the circuit court's denial of Woods's *Beck* claim was an unreasonable application of Supreme Court precedent. These sparse pieces of evidence do not justify a jury instruction on the lesser-included charge of manslaughter.

## I.      Woods's claim that the prosecutor struck African-Americans in a racially discriminatory fashion

Woods argues that the trial court allowed the State to use its preemptory strikes to remove all but two African-Americans in violation of federal law.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[7] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it for two reasons. First, pursuant to Rules 32.2(a)(3) and (a)(5), Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Second, the circuit court correctly found that the claim was insufficiently pleaded under Rules 32.3 and 32.6(b) because Woods failed to plead specific facts showing that the State indeed struck jurors in a discriminatory fashion. Pursuant to *Borden*, 646 F.3d at 812-13, this Court alternatively finds that Woods has not made the requisite showing under 28 U.S.C. § 2254(d).

It is clearly established Federal law that, under the Equal Protection Clause, a criminal defendant has a constitutional "right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson v. Kentucky*, 476 U.S. 79, 85–86, 106 S. Ct. 1712, 1717 (1986). In *Batson*, the Supreme Court

---

[7]     While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

established a three-step inquiry to evaluate a prosecutor's use of peremptory strikes. *Id.* at 96–98, 106 S. Ct. at 1723.

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller–El v. Cockrell*, 537 U.S. 322, 328-29, 123 S. Ct. 1029, 1035 (2003). The circuit court did not unreasonably find that Woods did not meet this burden because Woods does not make the requisite prima facie case. Accordingly, Woods is entitled to no relief on this claim.

## J.   Woods's claim that the trial court improperly admitted victim-impact evidence during the guilt phase of trial

Woods argues that the trial court improperly permitted the testimony of the three slain officers' widows, each of whom described the unique impact of her husband's death, violating his rights to due process and a fair trial.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[8] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

---

[8]    While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

In the alternative, the circuit court correctly dismissed it for two reasons. First, pursuant to Rules 32.2(a)(3) and (a)(5), Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Second, the circuit court correctly found that the claim was facially meritless because the challenged evidence—brief testimony from the victims' widows—was not improper victim-impact testimony. Thus alternatively, pursuant to 28 U.S.C. § 2254(d), the circuit court's determination was neither contrary to nor an unreasonable application of clearly established Federal law, nor an unreasonable determination of the facts, and Woods is not entitled to relief.

Woods cites cases that affirm the Supreme Court's frequently-repeated concern that the sentencer's focus be on the individual offender's characteristics and his crime. *See Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978 (1976); *Williams v. New York*, 337 U.S. 241, 69 S. Ct. 1079 (1949). Additionally, as previously noted, the Supreme Court has stated in the context of discussing victim-impact evidence at the penalty phase of a trial, "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally

unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne*, 501 U.S. at 825, 111 S. Ct. at 2608.

In finding that this claim was facially meritless, the circuit court did not unreasonably apply these precedents. The court explained:

> [I]t is well settled that:
>
>> It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [the defendant] did not receive a fair trial simply because the jurors were told what they probably had already suspected—that [the victim] was not a 'human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents.
>
> *Ex parte Walker*, 972 So. 2d 737, 747 (Ala. 2007) (quoting *Ex parte Rieber*, 663 So. 2d 999, 1006 (Ala. 1995).

Vol. 30, Tab #R-62, at C. 59-60. This Court has reviewed the trial transcript and has determined that, even assuming it was evidentiary error to allow the widows' brief testimony, it did not result in a fundamentally unfair trial. As the last three witnesses of the State's case-in-chief, the State called Bobbie H. Owen, Officer Owen's widow; Susan Bennett, Officer Bennett's widow; and Stacy Renae Sellers, Officer Chisholm's widow. Each witness answer several basic questions, including how she knew the respective officer (i.e., stating that he was her husband), how old

the officer was at the time of his death, how long they had been married, whether they had children and if so, how many, how long the officers had been with the police department and what they had done for a living prior to becoming a Birmingham police officer, how far the officer had had to travel from home to work in the West Precinct on the morning of the murders, whether they had spoken to their husbands on the morning of the murders, whether they saw the officers alive again after they left for work that morning, and where and when they next saw the officers' bodies. Officer Owen's widow also testified as to some other health problems that Officer Owen had prior to his death and explained why his nickname was "Curly." Officer Bennett's widow also stated that her daughter was four years old when Officer Bennett was murdered. This line of basic questioning did not render the trial fundamentally unfair to Woods, and he is not entitled to relief on this claim.

### K. Woods's claim that the trial court erred by "double counting" in sentencing him to death

Woods argues that his constitutional rights were violated when the trial court found the existence of the aggravating circumstance that two or more persons were killed "by one act or pursuant to one scheme or course of conduct," *see* Ala. Code § 13A-5-49(9), to be a statutory aggravator making him eligible for the death penalty when the same aggravating circumstance had already been established by

virtue of the jury's verdict that Woods was guilty pursuant to Ala. Code § 13A-5-40 (10) (defining capital murder "wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct"). According to Woods, the use of this circumstance both as aggravation in the first phase and as aggravators in the penalty phase failed to narrow the class of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty, and subjected him to two punishments as a result of his conviction.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[9] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it for two reasons. First, pursuant to Rules 32.2(a)(3) and (a)(5), Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Second, the circuit court correctly found that the claim was facially meritless because the practice of double counting is constitutionally permissible. Indeed, the

---

[9]     While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

practice of double counting is codified in Ala. Code § 13A-5-50, which provides: "The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence." Further, Alabama courts have consistently upheld sentences that resulted from the use of "double counting." *See*, *e.g.*, *Ex parte Waldrop*, 859 So. 2d 1181, 1187–88 (Ala. 2002); *Lam Luong v. State*, 199 So. 3d 172, 231 (Ala. Crim. App. 2015); *Shanklin v. State*, 187 So. 3d 734, 803–04 (Ala. Crim. App. 2014); *Wiggins v. State*, 193 So. 3d 765, 820–21 (Ala. Crim. App. 2014).

Pursuant to 28 U.S.C. § 2254(d), the circuit court's determination that this claim was meritless was neither contrary to nor an unreasonable application of clearly established Federal law, nor an unreasonable determination of the facts, and Woods is not entitled to relief. The Alabama Supreme Court recently reaffirmed the practice of double counting in *Ex parte Bohannon*, 222 So. 3d 525, 528-34 (Ala. 2016), a case involving the applicability of the Supreme Court's decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), to Alabama's capital scheme. As discussed in *Bohannon*, in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), the United States Supreme Court held that the Constitution requires that any fact that

increases the penalty for a crime above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. Then in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002), the United States Supreme Court, applying its decision in *Apprendi* to a capital-murder case, held that the right to a jury trial guaranteed by the Sixth Amendment requires that a jury "find an aggravating circumstance necessary for imposition of the death penalty." 536 U.S. at 609, 122 S. Ct. at 2443. Thus, *Ring* held that, in a capital case, the Sixth Amendment right to a jury trial requires that the jury unanimously find beyond a reasonable doubt the existence of at least one aggravating circumstance that would make the defendant eligible for a death sentence. The United States Supreme Court in its recent decision in *Hurst* applied its holding in *Ring* to Florida's capital-sentencing scheme and held that the scheme was unconstitutional because, under that scheme, the judge, not the jury, found the existence of the aggravating circumstance that made Hurst death-eligible. 136 S. Ct. at 622. The court in *Bohannon* upheld Alabama's capital scheme against a constitutional challenge because in Alabama, a jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death eligible. 222 So. 3d at 532. The United States Supreme Court denied certiorari in *Bohannon*, 137 S. Ct. 831 (2017) (mem.), and while a denial of certiorari

is not a ruling on the merits, *see, e.g., Powell v. Barrett*, 541 F.3d 1298, 1312 n.5 (11th Cir. 2008), it does indicate that any alleged error by the Alabama courts on this issue was not so grave as to warrant review. Given the foregoing, there does not appear to be any clearly established Federal law that the circuit court violated in ruling that Woods's claim about double counting was facially meritless.

### L. Woods's claim that the trial court improperly admitted hearsay evidence in the form of police dispatch tapes in violation of federal law

Woods argues that his rights to confront the witnesses offered against him, due process, a fair trial, and a reliable sentence, as secured by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, were violated when the trial court allowed the State to introduce hearsay in the form of dispatch tapes documenting radio communications between the Fairfield and Birmingham police departments. The substance of each communication submitted to the jury was intended to establish the existence and validity of the alleged warrant against Woods.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[10] or Alabama

---

[10] While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it pursuant to Rules 32.2(a)(3) and (a)(5), because Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

### M. Woods's claim that the trial court erred by allowing Officer Collins to testify to hearsay statements of an unidentified man in violation of federal law

Woods argues that the trial court improperly admitted prejudicial hearsay evidence when it permitted Officer Collins to testify about the statement of an unidentified man in Woods's neighborhood shortly before the shooting. More specifically, Officer Collins testified that he heard someone working on cars in the alleyway behind the house walk away from the police saying, "I don't want no part in this." During closing arguments, the State relied on this statement by asking what it was that "this man did not want a part of? What did he know? He heard them plot" the shooting. Woods argues that the admission of these statements violated his right to confront witnesses against him under the Sixth and Fourteenth Amendments.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[11] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it pursuant to Rules 32.2(a)(3) and (a)(5), because Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

## N. Woods's claim that the trial court erred in allowing Fernando Belser to testify to a hearsay statement of Kerry Spencer in violation of federal law

Woods argues that the trial court erroneously admitted prejudicial hearsay evidence when the State's witness Fernando Belser testified that he heard Woods's co-defendant Kerry Spencer talk about how he was "tired of the police F'ing with him . . . if they didn't stop or something, he would light them up." Woods argues that admission of this evidence violated his due process and confrontation rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

---

[11] While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[12] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it pursuant to Rules 32.2(a)(3) and (a)(5), because Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

### O. Woods's claim that the trial court erred by failing to secure reliable and accurate records of the proceedings

Woods makes two specific contentions with regard to this claim: (1) the trial court erred in ordering the destruction of the questionnaires of those venire members who did not serve on the final jury, and (2) the trial court erred in failing to preserve a record of part of the discussion between the attorneys and the court concerning the admission of rap lyrics and violent drawings in Woods's possession during his time in prison before the trial. Woods also asserts that other omissions "pervade" the record, but he does not specify what they are. Woods argues that

---

[12]    While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

the trial court's failure to secure a reliable and adequate record of the proceedings violated his federal and constitutional rights.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[13] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it for two reasons. First, pursuant to Rules 32.2(a)(3) and (a)(5), Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Second, the circuit court correctly found that the claim was insufficiently pleaded under Rules 32.3 and 32.6(b) because Woods failed to plead specific facts showing that he was entitled to relief on this claim. Pursuant to *Borden*, 646 F.3d at 812-13, this Court alternatively finds that Woods has not made the requisite showing under 28 U.S.C. § 2254(d).

The circuit court's determination was neither contrary to nor an unreasonable application of clearly established Federal law, nor an unreasonable

---

[13] While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

determination of the facts, and Woods is not entitled to relief. Woods cites *Draper v. Washington*, 372 U.S. 487, 497, 83 S. Ct. 774, 780 (1963), for the rule that the State must provide an indigent defendant with a transcript when that transcript is needed for an effective defense or appeal. However, an indigent defendant is not necessarily entitled to a full and verbatim transcript in every case, when his right can be satisfied by providing him with other written substitutes that report the portions of the trial that underlie his appellate contentions. *See id.* at 495, 83 S. Ct. at 779. In *Draper*, the defendants had requested a free transcript, but the state opposed the motion and offered an affidavit embodying the prosecutor's narrative version of the evidence. A hearing was held three months after the trial at which the defendants and their former counsel were afforded an opportunity to develop objections. Afterwards, the judge denied the defendants' motion for the transcript, setting forth the facts that *he* found had been proven at trial. All of the materials— the affidavit, the transcript of the hearing, and the judge's findings—were before the state appellate court on review of the convictions. However, the Supreme Court concluded that these materials did not constitute a "record of sufficient completeness." *Id.* at 497, 83 S. Ct. at 780. Because the facts of *Draper* are far different from the facts made the basis of Woods's claim here, he has not established that he is entitled to relief pursuant to 28 U.S.C. § 2254(d).

**P.** **Woods's claim that the trial court erred in admitting photographs of the victims' injuries**

Woods argues that the graphic photographs of the crime scene should have been excluded because they naturally aroused the passion, prejudice, and sympathy of the jury, thus creating an unconstitutionally high risk that the jury arbitrarily imposed a guilty verdict and death sentence.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[14] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it for two reasons. First, pursuant to Rules 32.2(a)(3) and (a)(5), Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Second, the circuit court correctly found that the claim was facially meritless because it relied upon Alabama law for its statement that "[i]t is well settled that photographs depicting the crime scene and the nature of the victims' wounds are

---

[14]     While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

relevant and admissible, even if the photographs are gruesome, cumulative, or relate to an undisputed matter." Vol. 30, Tab #R-62, at C. 68.

Pursuant to 28 U.S.C. § 2254(d), the circuit court's determination was neither contrary to nor an unreasonable application of clearly established Federal law, nor an unreasonable determination of the facts, and Woods is not entitled to relief. Woods cites *Gregg v. Georgia*, 428 U.S. 153, 196-98, 96 S. Ct. 2909, 2936-37 (1976), which reaffirmed the Supreme Court's acceptance of the use of the death penalty in the United States but set forth two broad guidelines that state legislatures must follow in order to craft constitutional capital sentencing schemes. He also cites *Zant v. Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 2742 (1983), in which the Supreme Court held that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." These and other precedents establish the principles that the death penalty may not be applied in an arbitrary and capricious manner and that the sentencer's focus be on the individual offender and his crime, which includes a consideration of any relevant mitigating circumstance, but they do not lead to the foregone conclusion that the trial court's allowance of crime scene

photographs in this case was violative of Woods's constitutional rights. Accordingly, he is due no relief.

**Q.    Woods's claim that he was denied a fair trial because the trial judge prejudged his guilt**

According to Woods, the trial judge's comment during a bench conference with the attorneys during voir dire that "[y]ou'd have to be living on another planet not to think there might not be some culpability," Vol. 12, Tab #R-12, at R. 375, shows that he had concluded that Woods was in part responsible for the crime at issue, and that his failure to recuse himself violated Woods's right to due process, a fair trial, and a reliable sentence, as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[15] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it for two reasons. First, pursuant to Rules 32.2(a)(3) and (a)(5), Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by

---

[15]    While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Second, the circuit court correctly found that the claim was insufficiently pleaded under Rules 32.3 and 32.6(b) because Woods failed to plead specific facts showing that he was entitled to relief on this claim. Because a Rule 32 dismissal for lack of specificity is a merits ruling in this circuit, *see Borden*, 646 F.3d at 812-13, this Court alternatively conducts the deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d).

The circuit court's determination was not contrary to nor an unreasonable application of clearly established Federal law, nor was it an unreasonable determination of the facts, and Woods is not entitled to relief. Woods cites *In re Murchison* for the proposition that it is clearly established that due process demands that the judge be unbiased. *See* 349 U.S. 133, 136, 75 S. Ct. 623, 625 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases."). *Murchison* prohibited a judge from performing prosecutorial and judicial functions in the same case. The judge acted as a "one-man grand jury," and two witnesses appeared before him. *Id.* at 134, 75 S. Ct. at 624. The same judge later charged the witnesses with contempt based on their grand jury testimony, then tried them and convicted them. *Id.* at 134-

35, 75 S. Ct. at 624-25. The judge, during the contempt proceedings, had recalled his own personal impressions from the grand jury proceedings, so there was explicit evidence present of the influence of the grand jury proceedings on the judge. *Id.* at 138, 75 S. Ct. at 626. The holding of *Murchison* is that a judge may not serve as both an investigator in a grand jury and as a judge in a contempt proceeding based on testimony before the grand jury. *See id.* Woods also cites *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016), in which the Court essentially reaffirmed the holding that a constitutionally intolerable probability of bias exists when the same person serves as both accuser and adjudicator in a case. Neither case is on point, and as the Supreme Court has recognized, "most matters relating to judicial disqualification [do] not rise to a constitutional level." *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 702, 68 S. Ct. 793, 804 (1948); *see also Tumey v. Ohio*, 273 U.S. 510, 523, 47 S. Ct. 437, 441 (1927) ("All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, *personal bias*, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion.") (emphasis added). Woods is not entitled to relief on this claim.

### R. Woods's claim that the trial court erred by permitting the presence of uniformed law enforcement officers during the trial

Woods contends that the presence of uniformed law enforcement officers throughout his trial created an atmosphere of intimidation that biased the jury in favor of a guilty verdict and death sentence. More specifically, prior to trial, Woods's lawyers obtained an internal memo from the Birmingham Police Department that directed law enforcement personnel to display "[a]n overwhelming police presence" at Woods's trial. Vol. 2, Tab #R-2, at C. 345. Officers were instructed to wear either their uniforms or, if off-duty, their badges. *Ibid.* The memo also noted that officers should make their presence "noticeable outside as well as inside the courtroom." *Ibid.* After receiving this memorandum, defense counsel filed a motion to prevent law enforcement personnel from intimidating or otherwise prejudicing venire members or jurors. *Id.* at C. 342. The trial court denied the motion. Vol. 1, Tab# R-2, at C. 14; Vol. 12, Tab# R-7, at R. 107. Subsequently, Woods contends, numerous officers from the Birmingham Police Department crowded the courtroom throughout Woods's trial. Woods also asserts that a memorial for the slain officers was placed in full view on a tree outside the courthouse. Woods contends that the trial court's failure to intervene violated his right to an impartial jury and created an unconstitutionally high risk that jurors arbitrarily rendered their guilty verdict and life sentence, in violation of

the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[16] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it for two reasons. First, pursuant to Rules 32.2(a)(3) and (a)(5), Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Second, the circuit court correctly found that the claim was insufficiently pleaded under Rules 32.3 and 32.6(b) because Woods failed to plead specific facts showing that he was entitled to relief on this claim. Because a Rule 32 dismissal for lack of specificity is a merits ruling in this circuit, *see Borden*, 646 F.3d at 812-13, this Court alternatively conducts the deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d).

---

[16] While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

The circuit court's determination was not contrary to nor an unreasonable application of clearly established Federal law, nor was it an unreasonable determination of the facts, and Woods is not entitled to relief. The circuit court explained that:

> [Woods] has not pleaded specific facts showing that law enforcement officers intimidated and/or prejudiced jurors in any way. Nor has he pleaded specific facts which would show that the trial court erred in denying his motion to prevent an "overwhelming" police presence at trial. Rather, Woods's claim is composed entirely of bare, unsupported allegations that law enforcement officers intimidated or otherwise prejudiced jurors at his trial.

Vol. 30, Tab #R-62, at C. 71 (citation omitted). Woods cites *Witherspoon v. Illinois*, 391 U.S. 510, 521, 88 S. Ct. 1770, 1776 (1968), for the proposition that a criminal defendant is entitled to an impartial jury, and *Tucker v. Zant*, 724 F.2d 882 (11th Cir. 1984), in which the Eleventh Circuit held that the Constitution prohibits extrinsic considerations "aimed at inflaming the jury's passions, playing on its fears, or otherwise goading it into emotional state more receptive to call for imposition of death." *Id.* at 888. *Tucker* is distinguishable, as in that case the court held that the prosecutor's statements at the penalty phase that, although his office rarely sought the death penalty, the defendant was "not the type of man you're going to want to take a chance on living," and if he was executed, the prosecutor would "sleep just as good, or [] sleep better knowing that one of them won't be on

the street." *Id.* at 889. The Eleventh Circuit concluded that this argument was improper because the prosecutor had assured the jurors that someone with greater experience had made the decision that defendant deserved death, rather than the jury and the statements served to "only to arouse the generalized fears of the jurors and divert the focus of their attention from the character of this crime and this criminal." *Id.* Given these precedents, the circuit court was not unreasonable in concluding that this claim failed as insufficiently pleaded.

### S. Woods's claim that the trial court erred by allowing testimony from the State's handwriting expert

Woods claims that the trial court erroneously allowed the State to introduce the testimony of Steven Drexler as a handwriting expert. Drexler compared the handwriting obtained from Woods to handwriting of an unknown origin used to produce rap lyrics discussing violence against police officers. Woods takes issue with the fact that Detective Phillip Russell, not Drexler, collected the handwriting samples from Woods as well as the methods the detective used. Woods argues that the admission of this evidence violated Woods's right to due process, a fair trial, and a reliable sentence, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[17] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it for two reasons. First, pursuant to Rules 32.2(a)(3) and (a)(5), Woods could have raised it at trial or on direct appeal but did not. As the Eleventh Circuit has held that claims barred by these rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Second, the circuit court correctly found that the claim was insufficiently pleaded under Rules 32.3 and 32.6(b) because Woods failed to plead specific facts showing that he was entitled to relief on this claim. Because a Rule 32 dismissal for lack of specificity is a merits ruling in this circuit, *see Borden*, 646 F.3d at 812-13, this Court alternatively conducts the deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d).

The circuit court's determination was not contrary to nor an unreasonable application of clearly established Federal law, nor was it an unreasonable determination of the facts, and Woods is not entitled to relief. As recognized by

---

[17]    While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

Woods, the standard is whether the admitted evidence is "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352, 493 S. Ct. 668, 674 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790, 790, 97 S. Ct. 2044, 2048 (1977) (holding that due process was not violated by admission of evidence to identify perpetrator and link him to another perpetrator even though the evidence also was related to crime of which defendant had been acquitted)); *see also Estelle*, 502 U.S. at 72, 112 S. Ct. at 482 (holding that defendant's due process rights were not violated by admission of evidence of battered child syndrome, which the defendant argued was irrelevant under state law) (citing *Spencer v. Texas*, 385 U.S. 554, 563–64, 87 S. Ct. 648, 653–54 (1967) ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. . . . But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure.")). Woods has not established that the circuit court unreasonably applied these precedents in finding that he had failed to state a claim upon which relief could be granted.

**T.    Woods's claim that the trial court violated his right to a fairly drawn jury by improperly constructing the strike list**

Woods claims that during jury selection, the trial judge arbitrarily selected the panel from which the parties would strike down to the final jury by eliminating

venire members alphabetically by last name. Woods argues that by failing to construct the strike list through random sampling, the trial court deprived him of his rights to a jury drawn from a fair cross-section of the community, due process, a fair trial, and a reliable sentence, as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[18] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed it for three reasons. First, the claim could have been raised at trial and on direct appeal, but it was not, and so it was barred by Rules 32.2(a)(3) and (a)(5). As the Eleventh Circuit has held that claims barred by those rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief. Second, the circuit court correctly found that the claim was insufficiently pleaded under Rules 32.3 and 32.6(b) because Woods failed to plead specific facts showing that the jury was not impartial or that the trial court's method of constructing the strike list was

---

[18]  While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

improper. Third, the circuit court found that the claim was facially meritless. Pursuant to 28 U.S.C. 2254(d), then, the Court thus alternatively finds that the circuit court's determination was neither contrary to nor was it an unreasonable application of clearly established Federal law, nor an unreasonable determination of the facts, and Woods is not entitled to relief.

As clearly established Federal law, Woods cites *Taylor v. Louisiana*, 419 U.S. 522, 531, 95 S. Ct. 692, 698 (1975), in which the Supreme Court held that Louisiana's constitutional and statutory provisions excluding women from jury service unless they had previously filed a written declaration violated the Sixth Amendment's requirement that a jury be selected from a representative cross-section of the community. The case is distinguishable and thus fails to aid Woods in establishing that the circuit court unreasonably applied Supreme Court precedent pursuant to 28 U.S.C. § 2254(d).

U. **Woods's claim that the trial court erred during the penalty phase by allowing State witnesses to give their opinions on the appropriate sentence**

Woods claims that at the penalty phase, the trial court improperly and over defense objection allowed the State to ask its witnesses to tell the jury what sentence they believed would be appropriate. *See* Vol. 21, Tab #R-24, at R. 1842–44, 1849. Each witness asked the jury to impose a death sentence. *See id.* Woods

argues that the trial court's allowance of this testimony violated Woods's rights to due process and a fair sentencing determination guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Woods raised this claim in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals[19] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court properly dismissed the claim for two reasons: it was precluded by Alabama Rule of Criminal Procedure 32.2(a)(4) and it was facially meritless. First, since the Alabama Court of Criminal Appeals had denied it on the merits on plain error review on direct appeal, the circuit court could not consider it pursuant to Rule 32.2(a)(4). Although the Eleventh Circuit has held that preclusion due to Rule 32.2(a)(4) is not a bar to habeas review, *see Williams*, 791 F.3d at 1274-76, the claim is due to be dismissed pursuant to 28 U.S.C. § 2254(d) because both the circuit court and the Alabama Court of Criminal Appeals (on direct appeal) reasonably held that the claim was meritless. As the Alabama Court of Criminal Appeals explained on direct appeal:

---

[19]   While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

During the State's rebuttal case at the penalty phase, the prosecutor asked Bobbie Owen what she thought the appropriate sentence would be in this case, and defense counsel objected and cited Rules 401 and 403, Ala. R. Evid. (R. 1841–42.) When the prosecutor asked the same question of Susan Bennett and Stacy Sellers, Woods did not object. Each witness testified that she thought a death sentence would be appropriate. On appeal, Woods does not raise this issue. We note, nonetheless, that the trial court acted well within its discretion to permit this testimony because during the defense case, Woods asked the witnesses what sentence they believed was appropriate and they testified that a life-imprisonment-without-parole sentence would be appropriate for him. (R. 1804, 1810–11, 1819, 1825–26.) *See, e.g., Ex parte D.L.H.*, 806 So. 2d 1190, 1193 (Ala. 2001) ("When one party opens the door to otherwise inadmissible evidence, the doctrine of 'curative admissibility' provides the opposing party with 'the right to rebut such evidence with other illegal evidence.' McElroy's Alabama Evidence, § 14.01, p. 49 (5th ed. 1996)."). Testimony from a victim's family member as to a sentencing recommendation is generally not admissible in a capital case. *See, e.g., Stallworth v. State*, 868 So. 2d 1128, 1176 (Ala. Crim. App. 2001). Because Woods offered such testimony at the penalty phase of his trial, however, we find that, under the facts of this case, no plain error occurred as a result of the State's witnesses' testimony in rebuttal about a recommended sentence.

*Woods*, 13 So. 3d at 36 n.6.

The state courts' determination that the claim lacked merit was neither contrary to nor an unreasonable application of clearly established Federal law, nor was it an unreasonable determination of the facts, and Woods is not entitled to relief. Woods cites *Payne v. Tennessee*, *supra*, as clearly established Federal law. In *Payne*, the Supreme Court held that the Eighth Amendment does not *per se* prohibit

the introduction of victim-impact evidence and prosecutorial argument on that subject. 501 U.S. at 827, 111 S. Ct. at 2609. The Court reasoned that allowing the jury to consider the defendant, but not the victim, would create an unbalanced picture, stating, "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Id.* at 825, 111 S. Ct. at 2608 (quotation marks and citation omitted). Here, the state courts found that Woods had opened the door to witness-sentencing-recommendation evidence, so the admission of such evidence did not violate Alabama law. This Court finds no constitutional error in the state courts' merits determination.

**V.    Woods's claim that the trial court erred in allowing improper rebuttal evidence in the form of victim-impact testimony at the penalty phase**

Woods claims that the trial court also erroneously permitted the State to introduce, over defense objection, victim-impact evidence as its rebuttal to the defense's mitigation witnesses during the penalty phase. *See* Vol. 21, Tab #R-24, at R. 1846. Woods contends that this admission denied him rights to due process and

a reliable sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Woods raised this claim in his Rule 32 proceedings, but he did not raise this claim in the Alabama Court of Criminal Appeals or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court properly dismissed it for two reasons: it was precluded by Alabama Rule of Criminal Procedure 32.2(a)(4) and it was insufficiently pleaded under Rules 32.3 and 32.b(b). First, since the claim had been raised and rejected on direct appeal by the Alabama Court of Criminal Appeals, the circuit court could not consider it pursuant to Rule 32.2(a)(4). Although the Eleventh Circuit has held that preclusion due to Rule 32.2(a)(4) is not a bar to habeas review, *see Williams*, 791 F.3d at 1274-76, the claim is due to be dismissed pursuant to 28 U.S.C. § 2254(d) because the state courts did not unreasonably apply Federal law in finding that the claim was meritless or insufficiently pleaded.

As the Alabama Court of Criminal Appeals explained on direct appeal, the allegedly improper victim-impact testimony was offered by the officers' widows in rebuttal to mitigation evidence that had been offered on Woods's behalf:

Here, the testimony provided by the officers' widows was offered to show that each officer's death caused a unique loss to his family and to show the impact the murders had on the family members. Part of that testimony, the portion about which Woods apparently is complaining here, was elicited to show that Officer Owen was married and had children and grandchildren, that Officer Bennett was married and had a child, and that Officer Chisolm was married and had planned to start a family. This testimony was offered in rebuttal to the evidence Woods offered as mitigation—that he was a father of three children whom he loved very much. This was legitimate victim-impact evidence, which we have previously held to be admissible during the penalty phase of a capital-murder trial. *See, e.g., Belisle v. State*, 11 So. 3d 256, 317 (Ala. Crim. App. 2007). The trial court did not abuse its discretion when it permitted the witnesses to testify about the victims and their families.

*Woods*, 13 So. 3d at 35-36. Although Woods quarrels with the state courts' analysis, arguing that the State's victim-impact evidence was not responsive to and exceeded the scope of the evidence submitted by the defense in mitigation, he has not established that the state courts' conclusion was unreasonable. The Alabama Court of Criminal Appeals thoroughly discussed *Payne*'s application to Woods's claim. *See id.* at 35; *see also Payne*, 501 U.S. at 825, 111 S. Ct. at 2609. For the reasons discussed in the preceding section, the state courts' determination was neither contrary to nor an unreasonable application of clearly established Federal law, nor was it an unreasonable determination of the facts, and Woods is not entitled to relief.

**W.  Woods's claim that the trial court misled the jury about the weighing process at the penalty phase**

Woods claims that the trial court misled the jury about the penalty-phase weighing process in a manner that biased the jury's decision in favor of a death sentence. Woods contends that although the trial court distinguished aggravating and mitigating circumstances, it did not instruct jurors on the permissible outcomes of the weighing process or provide guidance to jurors on the appropriate sentencing verdict if they concluded that the aggravating and mitigating circumstances were equally balanced, creating a risk that that the jury believed itself obligated to return a verdict of death if it found the aggravating and mitigating circumstances were in equipoise. According to Woods, the trial court's failure to explain the weighing process deprived the jurors of any guidance regarding how to exercise their discretion at sentencing, in violation of state and federal law.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Court of Criminal Appeals[20] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

In the alternative, the circuit court correctly dismissed the claim because it could have been raised at trial or on direct appeal, but it was not, and so it was barred by Rules 32.2(a)(3) and (a)(5). As the Eleventh Circuit has held that claims

---

[20]    While Woods raised a claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

barred by those rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Assuming solely for argument that the claim was not procedurally barred, Woods has not demonstrated that it has merit. The only Federal case law he cites is *Morgan v. Illinois*, in which the Supreme Court stated, "[T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that [juror's] inability to follow the law. . . . Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law." 504 U.S. 719, 735, 112 S. Ct. 2222, 2233 (1992) (internal citation omitted). In *Morgan*, then, the Supreme Court held that a defendant on trial for his life may inquire of potential jurors whether they hold such a belief. *See id.* Woods contends that this precedent entitles him to an adequate voir dire, which is true, but he nonetheless does not establish that his rights were violated. Here, the record reflects that the trial court gave the following explanation of aggravating and mitigating circumstances throughout voir dire and during closing arguments at the penalty phase: "an aggravator indicates or tends to indicate that the defendant should be sentenced to death. A mitigator indicates or tends to indicate that the defendant should be sentenced to life without parole instead." *See, e.g.*, Vol. 12, 13 Tab #R-9 at R. 214, 232, 250, 260, 281; Vol. 21, Tab #R-25, at R. 1851. Woods's

conclusory allegation that this explanation unreasonably raised the risk that jurors applied a weighing process tilted toward death is unsupported, and if the claim were not barred, Woods would not be entitled to relief.

## X.    Woods's claim that the trial court impermissibly considered extraneous evidence in sentencing him

Woods takes issue with the fact that, following the jury's vote to impose the death penalty, the trial court considered at the final sentencing hearing a letter that Stacy Sellers, Officer Chisholm's widow, had received from Woods after the trial stating, "I will forgive, but I won't forget." Woods argues that this evidence, introduced only to the trial court, did not undermine any of the mitigating circumstances presented in this case and was otherwise irrelevant to any of the issues at sentencing.

Woods raised this claim for the first time in his Rule 32 proceedings, but he did not raise this claim in the Court of Criminal Appeals[21] or Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

---

[21]    While Woods raised the claim that he was denied effective assistance of counsel regarding this underlying claim, that is a different claim for exhaustion purposes.

In the alternative, the circuit court correctly dismissed the claim because it could have been raised at trial or on direct appeal, but it was not, and so it was barred by Rules 32.2(a)(3) and (a)(5). As the Eleventh Circuit has held that claims barred by those rules are procedurally defaulted from habeas review, *see Boyd*, 697 F.3d at 1335, Woods is due no relief.

Assuming solely for argument that the claim was not procedurally barred, Woods has not demonstrated that it has merit. The only Federal case law he cites is *Middleton v. McNeil*, 541 U.S. 433, 124 S. Ct. 1830 (2004), with no explanation of its applicability. There, the Supreme Court repeated the rule that, in order for an erroneous jury instruction to give rise to a constitutional violation, the instruction must "so infect[] the entire trial that the resulting conviction violates due process." *Id.* at 437, 124 S. Ct. at 1832 (quotation marks and citation omitted). A conclusory assertion that constitutional rights were violated, with no supporting facts or explanation, does not entitle Woods to relief, even if the claim was not barred.

## AA.[22]    Woods's claim that he was denied effective assistance of trial counsel during the guilt phase of his trial

---

[22] Woods's Amended Petition organized his claims in alphabetical order, but he omitted the letters "H" and "M." Accordingly, Woods's Amended Petition's claims go through the letter "Z" and then begin over again with "AA." This Court will also start over with "AA" to keep as consistent as possible with Woods's Amended Petition.

Woods includes numerous sub-claims within this claim. First, he contends that trial counsel failed to adequately investigate and present evidence in support of his defense, such as by failing to request funds for investigative expenses and expert assistance, failing to obtain independent testing of the shirt that Woods was wearing at the time of the incident for mace, failing to test latent fingerprints found on the bathroom window of the apartment where the shootings occurred, and failing to test a shoe print found in the bathtub of the apartment, failing to investigate and present evidence that the officers involved in this case had a reputation for corruption and violence, failing to present an independent handwriting expert who could have contradicted the testimony of the State's handwriting expert that Woods had written the violent rap lyrics found in his cell after the murders, failing to present evidence from an expert in trace evidence that would have allegedly testified that there was no gun powder residue or other indication that Woods had fired a weapon on the day of the incident, failing to investigate and present evidence in support of a voluntary intoxication defense, failing to request a jury instruction on the lesser-included offense of manslaughter, failing to investigate and present evidence about the respective roles that Woods and Kerry Spencer played in the drug house, and failing to obtain the complete record from Kerry Spencer's trial.

Woods's second sub-claim is that his trial counsel provided ineffective assistance prior to trial by failing to move for a change of venue. Third, Woods contends that trial counsel provided ineffective assistance during jury selection by failing to raise a *Batson* objection, failing to use preemptory strikes against prospective jurors who had indicated they would not be favorable to the defense, and failing to object to the trial court's use of alphabetical order as a means of creating the strike list.

Woods's final sub-claim within this section is that trial counsel provided ineffective assistance by failing to adequately challenge the State's case during trial, specifically by failing to adequately cross-examine several of the State's witnesses; failing to object to prior bad acts testimony about Woods's involvement in drug sales and his prior gun use; failing to object to the testimony of Fernando Belser that if someone tried to enter the living room of the apartment without permission they would "get hurt pretty bad;" failing to object to the limiting instructions given by the trial court as to some prior bad acts testimony; failing to request jury instructions as to the testimony regarding Woods's prior drugs sales and gun use, the warrant for Woods's arrest, and the reference to locating Woods in the "city files" of people who have been arrested; failing to object to the alleged failure of the jury instructions to clearly define the specific intent required for a conviction of

capital murder; failing to object to the prosecutor's alleged misconduct in arguing that Woods may have shot Officer Bennett, even though there was no evidence to support that assertion, which, according to Woods, effectively shifted the burden of proof to Woods to demonstrate he did not shoot Officer Bennett; failing to object to the State's introduction of alleged hearsay evidence in the form of dispatch tapes documenting radio communications between the Fairfield and Birmingham police departments; failing to object to the introduction of alleged hearsay evidence when the court permitted Officer Collins to testify about the statement of an unidentified man in Woods's neighborhood shortly before the shooting; failing to object to the alleged hearsay testimony of Fernando Belser, who testified that he heard Kerry Spencer talk about how he was "tired of the police F-ing with him . . . if they didn't stop or something, he would light them up;" failing to object to the introduction of photographs depicting the victims' numerous injuries; failing to request that the trial judge recuse himself; failing to object to the State's submission of the testimony of Steven Drexler as a handwriting expert, without first requiring the State to establish the existence of a proved handwriting; failing to object to allegedly coercive tactics employed by the Birmingham Police department, including the presence of uniformed law enforcement officers throughout Woods's trial and the placement of a memorial to the slain officers in open view outside the

courtroom; failing to object to the State's submission of victim-impact evidence during the guilt phase; and failing to object to the trial court's alleged negligence in not securing a reliable and adequate record of the proceedings in the case.

This entire guilt-phase-ineffective-assistance-of-trial-counsel claim is a nearly verbatim recitation of the claim Woods raised in his Rule 32 petition. While he presented some of the aforementioned sub-claims to the Alabama Court of Criminal Appeals, he failed to raise the *entire* claim before that court or in his petition for certiorari in the Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305. Woods was required to "present the state courts with the same claim he urges upon the federal courts." *Picard v. Connor*, 404 U.S. 270, 276, 92 S. Ct. 509, 512 (1971). Regarding exhaustion, the Eleventh Circuit has stated, "While we do not require a verbatim restatement of the claims brought in state court, we do require that a petitioner presented his claims to the state court "such that a reasonable reader would understand each claim's particular legal basis and *specific factual foundation*." *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (citations omitted and emphasis added).

In the alternative, the Rule 32 court correctly dismissed this entire claim as insufficiently pleaded under Alabama Rules of Criminal Procedure 32.3 and 32.6(b)

because Woods failed to plead facts sufficient to show that he was entitled to relief.

As the court explained:

> Woods's guilt-phase IAC claims lack the requisite specificity to warrant an evidentiary hearing. Woods fails to plead specific facts in support of his allegations; his "claims" are wholly conclusory. Because his IAC allegations consist only of naked allegations unsupported by specific facts, Woods fails to state a valid claim for relief under Rule 32.

Vol. 30, Tab #R-62, at C. 83. The only sub-claim that the Rule 32 court specifically addressed in denying this claim was Woods's allegation that trial counsel was ineffective for failing to present an independent handwriting expert, stating:

> In the case at hand, Woods's conclusory allegations are insufficient to raise a cognizable IAC claim. For example, the allegation raised in paragraph 132 states, in its entirety:
>
>> Trial counsel failed to present an independent handwriting expert, who would have contradicted the testimony of the State's handwriting expert that Mr. Woods's (sic) had written lyrics found in his cell. If trial counsel had done so, they would have been able to attack the State's assertions that these lyrics represented an admission of the offense by Mr. Woods.
>
> (Pet. at 74) This assertion simply does not state a proper claim for relief. Woods has not identified any specific facts supporting his claim that counsel's performance was deficient. For example, Woods fails to specify exactly what information an "independent handwriting expert" would have uncovered, how this unnamed expert would have uncovered such information, whether/how trial counsel could have located the expert, whether the expert would have been available to testify at Woods's trial, or how the expert would have contradicted the

testimony of the State's handwriting expert. In sum, rather than offering any specific facts that allegedly would have been discovered through adequate investigation by an "independent handwriting expert," Woods offers only vague speculation. Further, Woods does not plead any facts tending to show exactly how testimony by this expert would have aided trial counsel in the presentation of his case; nor does he explain whether/how the results of the expert's investigation would have been admissible at trial. Moreover, Woods also failed to plead any specific facts indicating that he was prejudiced by counsel's acts or omissions—facts indicating that there existed a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Instead, this claim consists only of naked allegations unsupported by specific facts.

Saying so does not make it so ("*ipse dixit*," roughly, "he himself said it"). As noted above, a petitioner must ground his claims on facts within the record and not on mere conclusory allegations. An IAC claimant simply cannot meet his burden under *Strickland* based only on his own *ipse dixit*.

*Id.* at 83-87.

Additionally, with regard to the sub-claims that Woods *did* raise on appeal of the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals correctly affirmed the circuit court's dismissal of those sub-claims as insufficiently pleaded under Rule 32.6(b). The appellate court thoroughly discussed each sub-claim raised, as follows:

Woods next argues that the circuit court erred in summarily dismissing his claims of ineffective assistance of counsel because they lacked specificity.

"To sufficiently plead an allegation of ineffective assistance of counsel, a Rule 32 petitioner not only must

'identify the [specific] acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' *Strickland v. Washington*, 466 U.S. 668, 690, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984), but also must plead specific facts indicating that he or she was prejudiced by the acts or omissions, i.e., facts indicating 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' 466 U.S. at 694, 104 S. Ct. 2052. A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient."

*Hyde*, 950 So. 2d at 356 (emphasis added).

"'The claim of ineffective assistance of counsel is a general allegation that often consists of numerous specific subcategories. Each subcategory is an independent claim that must be sufficiently pleaded.' *Coral v. State*, 900 So. 2d 1274, 1284 (Ala. Crim. App. 2004), rev'd on other grounds, *Ex parte Jenkins*, 972 So. 2d 159 (Ala. 2005)."

*Daniel v. State*, 86 So. 3d 405, 416 (Ala. Crim. App. 2011).

. . .

Woods makes only one specific argument in this section of his brief. He argues that the circuit court erred in summarily dismissing his claim that his trial counsel was ineffective for failing to secure the services of a handwriting expert to counter the State's handwriting expert. In his Rule 32, Ala. R. Crim. P., petition, Woods merely pleaded the following:

"Trial counsel failed to present an independent handwriting expert, who could have contradicted the testimony of the State's handwriting expert that Mr. Woods had written lyrics found in his cell. If trial counsel had done so, they would have been able to attack the

State's assertions that these lyrics represented an admission of the offense by Mr. Woods."

(C.R.408.)

Evidence at Woods's trial established that police discovered a drawing in Woods's cell that depicted two men shooting firearms. "One man is shooting an assault rifle and three flaming skulls are depicted in the blasts from that weapon, and the other man is shooting two handguns. The drawing contains a heading at the top, 'NATE [Woods's nickname] $ NOOKIE [Spencer's nickname],' and depicts street signs at an intersection of '18th Street and Ensley.' When Deputy Gillum removed the drawing, Woods said that the drawing was his and that he wanted it back." 13 So. 3d at 14. The following lyrics, that were handwritten on a document in Woods's cell, were also discovered:

> "'Seven execution styles murders
>
> I have no remorse because I'm the f—ing murderer
>
> Haven't you ever heard of a killa
>
> I drop pigs like [codefendant] Kerry Spencer
>
> So when I walk around strapped
>
> One time bust the caps and watch pigs clapse
>
> Snapp, adapt to this because I needs no adapter this is just the first chapter.'"

13 So. 3d at 14. The State's expert testified that Woods wrote the lyrics.

When summarily dismissing the claim that counsel was ineffective for failing to secure a handwriting expert, the circuit court stated:

> "Woods fails to specify exactly what information an 'independent handwriting expert' would have uncovered, how this unnamed expert would have uncovered such information, whether/how trial counsel could have located the expert, whether the expert would have been available to testify at Woods's trial, or how the expert would have contradicted the testimony of the State's handwriting expert. In sum, rather than offering any specific facts that allegedly would have been discovered through adequate investigation by an 'independent handwriting expert,' Woods offers only vague speculation. Further, Woods does not plead any facts tending to show exactly how testimony by this expert would have aided trial counsel in the presentation of his case; nor does he explain whether/how the results of the expert's investigation would have been admissible at trial. Moreover, Woods also failed to plead any specific facts indicating that he was prejudiced by counsel's acts or omissions—facts indicating that there existed a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Instead, his claim consists only of naked allegations unsupported by specific facts."

(Suppl.C.R.86.)

When pleading a postconviction claim that trial counsel was ineffective for failing to secure the services of an expert, this Court has required that the petitioner include in its pleading the expert's identity and the content of that expert's expected testimony. As we have stated:

> "The circuit court correctly found that this claim was insufficiently pleaded because Washington failed to plead the identity of experts or the content of those experts'

testimony. *See McNabb v. State*, 991 So. 2d 313 (Ala. Crim. App. 2007); *Woods v. State*, 957 So. 2d 492 (Ala. Crim. App. 2004), rev'd on other grounds, 957 So. 2d 533 (Ala. 2006)."

*Washington*, 95 So. 3d at 64. *See also Windsor v. State*, 89 So. 3d 805 (Ala. Crim. App. 2009).

Neither did Woods plead how he was prejudiced by counsel's failure to secure a handwriting expert. The record shows that Steven Drexler, a former handwriting examiner with the Alabama Department of Forensic Sciences, testified that it was his opinion "that the questioned writing was written by the author of the Nathaniel Woods's handwriting standard." (Trial R. 1391.) Woods's counsel rigorously cross-examined Drexler, and he testified that he had, in fact, given two opinions in the case, that after issuing his first opinion he requested more writing samples, and that his second opinion more strongly suggests that the questioned sample had been written by Woods.

The record further shows that Woods's trial attorney did move for funds to hire an "independent expert for handwriting analysis." (Trial C.R. 1574.) That motion was granted. During a pretrial hearing, defense counsel discussed the fact that she was having difficulty securing an expert and had only just received discovery concerning the handwriting analysis from the State. (Trial R. 126.) It appears that a continuance was granted on that basis. Although Woods did not present his own expert on handwriting analysis, counsel did conduct a thorough cross-examination of the State's expert.

"[H]ow to deal with the presentation of an expert witness by the opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to forgo cross-examination and/or to forgo development of certain expert opinion, is a matter of trial strategy which, if reasonable, cannot be the basis for a successful ineffective assistance of counsel claim."

*Thomas v. State*, 284 Ga. 647, 650, 670 S.E.2d 421, 425 (2008).

Woods failed to comply with the pleading requirements of Rule 32.6(b), Ala. R. Crim. P.; therefore, the circuit court correctly summarily dismissed this claim. Woods is due no relief on this claim.

. . .

Woods next argues that the circuit court erred in summarily dismissing his claim that his trial counsel was ineffective for failing to adequately investigate and present evidence in support of his defense. We address those issues Woods specifically argues in this section of his brief.

. . .

First, Woods argues that his trial counsel was ineffective for failing to secure the services of several different experts. Specifically, Woods argues that counsel should have secured experts: (1) to conduct independent tests on the shirt he was wearing at the time of the murders to show that mace was on the shirt; (2) to test for latent fingerprints in the bathroom; and (3) to test a shoe print found in the tub to show that Woods left through the bathroom window and did not leave the apartment with his codefendant Spencer.

In Woods's postconviction petition, he pleaded the following facts relative to this claim:

"Trial counsel was constitutionally ineffective in failing to obtain independent testing of key items of physical evidence that would have substantiated the defense's case at trial. First, defense counsel should have obtained independent testing of the shirt that Mr. Woods was wearing at the time of the incident for mace. If trial counsel had done so, upon information and belief, these test results would have revealed the presence of mace. This would have supported testimony that Mr. Woods had been maced and would have corroborated the defense

theory that Spencer was reacting spontaneously to the use of force by the officers.

Trial counsel also should have gotten an independent evaluation of latent fingerprints found on the bathroom window. Upon information and belief, if trial counsel had done so, these latent prints would have matched Mr. Woods's fingerprints. Trial counsel also should have obtained an independent expert to evaluate the shoe print found in the bathtub. Upon information and belief, if trial counsel had done so, this shoe print would have been found to match Mr. Woods's shoes. These pieces of evidence would have demonstrated that Mr. Woods did not leave the apartment through the front door with Spencer as the State claimed but rather climbed out the bathroom window. This would have called into question the State's arguments that Mr. Woods was acting in concert with Spencer because they left together."

(Suppl.C.R.406.)

When addressing a similar claim that counsel was ineffective for failing to secure the presence of an expert, this Court in *Daniel v. State*, 86 So. 3d 405 (Ala. Crim. App. 2011), stated:

"Daniel failed to identify, by name, any forensic or DNA expert who could have testified at Daniel's trial or the content of the expert's expected testimony. Accordingly, Daniel failed to comply with the full-fact pleading requirements of Rule 32.6, Ala. R. Crim. P. *See McNabb v. State*, 991 So. 2d 313 (Ala. Crim. App. 2007) (claim that counsel was ineffective for failing to retain an expert not sufficiently pleaded because expert was not identified); *Woods v. State*, 957 So. 2d 492 (Ala. Crim. App. 2004), rev'd on other grounds, 957 So. 2d 533 (Ala. 2006) (claim of ineffective assistance of counsel not sufficiently pleaded because Woods failed to identify an expert by name)."

86 So. 3d at 425–26. As we stated previously, to sufficiently plead a claim that counsel was ineffective in failing to secure the services of an expert, the petitioner must identify the expert by name and plead his/her expected testimony.

Moreover, Woods failed to plead how he was prejudiced. Woods's trial record shows that counsel moved for funds to hire a private investigator. (Trial C.R. 133–34.) That motion was granted. (Trial C.R. 535.) Counsel also moved to inspect, examine, and test all physical evidence collected by the State. (Trial C.R. 237.) That motion was granted and the court wrote on the case-action summary: "Motion to inspect and examine physical evidence is granted and tests will require additional motions." (Trial C.R. 520.)

Furthermore, one of Woods's witnesses who was in the apartment at the time of the shootings, Markesha Williams, testified that she did not see Officer Chisholm spray pepper spray and that she has asthma and would have gotten sick if pepper spray had been sprayed in the apartment. (Trial R. 1470.) Another State witness, Fernando Belser, who was also present at the time of the shootings, testified that he did not see Officer Chisholm spray pepper spray, that he did not cough or smell any pepper spray, and that Woods was not coughing. Another State witness, Michael Scott, testified that he was at John Prather's house on the day of the shooting when Woods and Spencer ran into the back door of the house together. When asked about Woods's appearance, Scott testified that Woods was not coughing, that Woods did not have trouble breathing, that there were no tears coming from Woods's eyes, that there was nothing coming from Woods's nose, that Woods was not rubbing his eyes, and that Woods did not appear to have difficulty seeing in the minutes after the fatal shootings.

Woods's codefendant, Kerry Spencer, also testified that when he finished shooting his rifle he threw the rifle down and he and Woods ran from the apartment together down the alley and into a neighbor's house. (Trial R. 1595.) Two witnesses at the neighbor's

house testified that Woods and Spencer arrived at the neighbor's house together.

The circuit court committed no error in summarily dismissing this claim because Woods failed to satisfy the pleading requirements of Rule 32.6(b), Ala. R. Crim. P. Not only did Woods fail to plead full facts but also failed to plead how he was prejudiced by counsel's actions. This claim was correctly summarily dismissed and Woods is due no relief.

. . .

Woods next argues that his trial counsel was ineffective for failing to secure police records in order to establish discrepancies in police procedures that, he says, caused the confrontation that ultimately ended in three police officers being killed.

In regard to this claim, Woods pleaded the following:

"Trial counsel also failed to seek and obtain discovery of the policies and procedures of the Birmingham Police Department regarding the actions of the officers, including patrolling areas outside of your beat, conducting in-home arrests for a misdemeanor warrant from another jurisdiction and use of force. These documents would have allowed the defense to more effectively challenge the State's arguments that these officers were acting completely by the book and simply doing their duty at the time of this incident. Without these documents, defense counsel were left to simply ask police witnesses whether their colleagues had followed proper procedures without any independent ability to challenge their responses."

(C.R.407–08.) This claim was correctly summarily dismissed because Woods failed to include how he was prejudiced by the failure to secure the records. Woods's trial counsel did question the officers about

police procedures and why the police were at the apartment on the day of the shootings. Indeed, Woods's pleadings admit as much.

> "[E]xpert testimony on police procedures was unnecessary where counsel cross-examined the Commonwealth witnesses, who were police officers, in an effective manner so as to convey the same information. *See Commonwealth v. Marinelli*, 570 Pa. 622, 810 A.2d 1257, 1269 (2002) (rejecting claim that counsel was ineffective for failing to call a defense expert witness to refute testimony proffered by a Commonwealth witness when trial counsel engaged in effective cross-examination of the Commonwealth witness). The Commonwealth cogently notes that trial counsel elicited testimony both on direct and cross-examination establishing that Officer Wertz was wearing plainclothes, did not shout for Appellant to stop, did not display his badge, which was later recovered from his police vehicle, and that these actions violated police procedures. Trial counsel was not required to present additional expert testimony to establish facts which were already before the jury, and, indeed, were largely uncontested."

*Commonwealth v. Rivera*, 108 A.3d 779, 795 (Pa. 2014).

The circuit court correctly summarily dismissed this claim because it failed to satisfy the pleading requirements of Rule 32.6(b), Ala. R. Crim. P. Woods is due no relief.

. . .

Woods next argues that his trial counsel was ineffective for failing to investigate and present an intoxication defense. Woods merely pleaded the following in regard to this claim:

> "Trial counsel also failed to investigate and present evidence in support of a voluntary intoxication defense. Under Alabama law, voluntary intoxication can negate

the specific intent necessary for a conviction of capital murder, reducing the offense to manslaughter. *See Fletcher v. State*, 621 So. 2d 1010, 1019–21 (Ala. Crim. App. 1993). Counsel should have investigated and presented evidence that at the time of this incident, Mr. Woods was using 3.5 grams of cocaine everyday as well as using marijuana and drinking large amounts of alcohol. Mr. Woods snorted 4.5 grams of cocaine, smoked 1 ounce of marijuana, and drank 12 beers in the hours before the confrontations with police and was intoxicated at the time of the incident. Trial counsel also should have obtained an expert that could have explain[ed] the effects of cocaine addiction and intoxication on Mr. Woods's mental state. If trial counsel had investigated and presented this evidence of voluntary intoxication, there is a reasonable probability that Mr. Woods would have been convicted of a lesser offense.'

(C.R.408–09.)

In affirming the circuit court's summary dismissal of a similar claim that was raised in Spencer's, Woods's codefendant's, postconviction petition, this Court stated:

"This Court has held that a petitioner fails to plead sufficient facts regarding a claim that counsel failed to present an intoxication defense when he makes only a bare allegation that the petitioner was intoxicated at the time of the offense. As this Court has stated: '[The appellant] failed to allege how much he had to drink the night of the crime, how long before the crime he had been drinking, or any fact indicating that his alleged intoxication amounted to insanity.' *Connally v. State*, 33 So. 3d 618, 623 (Ala. Crim. App. 2007).

"'[The appellant] failed to plead sufficient facts to indicate that voluntary intoxication would have been a viable defense or that he would have been entitled to a

jury instructions on voluntary intoxication . . . ; thus, he failed to plead sufficient facts indicating that his trial counsel were ineffective in this regard.'

"*Mashburn v. State*, 148 So. 3d 1094, 1126–27 (Ala. Crim. App. 2013). This claim was insufficiently pleaded."

*Spencer v. State*, 201 So. 3d at 23–24. The same is true in this case. Woods failed to plead sufficient facts that would support a defense of intoxication.

"Mashburn failed to plead sufficient facts to indicate that voluntary intoxication would have been a viable defense or that he would have been entitled to jury instructions on voluntary intoxication or any lesser-included offenses; thus, he failed to plead sufficient facts indicating that his trial counsel were ineffective in this regard. *See, e.g., Connally v. State*, 33 So. 3d 618, 622-23 (Ala. Crim. App. 2007). Therefore, summary dismissal of this claim of ineffective assistance of counsel was proper."

*Mashburn v. State*, 148 So. 3d 1094, 1126–27 (Ala. Crim. App. 2013).

Moreover, in regard to Woods's claim that counsel was ineffective for failing to secure an expert to testify concerning the effects of cocaine and alcohol addiction, this Court has stated:

"Some courts have found that expert testimony on the effects of alcohol is not necessary because it concerns an issue within the common knowledge of a juror. As the Washington Court of Appeals stated in *State v. Thomas*, 123 Wash. App. 771, 98 P.3d 1258 (2004):

"'A voluntary intoxication defense allows the jury to consider "evidence of intoxication" to determine whether the defendant acted with the requisite intent. But unlike diminished capacity, it is not

necessary to present expert testimony to support an involuntary intoxication defense. The effects of alcohol are commonly known and jurors can draw reasonable inferences from testimony about alcohol use. *State v. Kruger*, 116 Wash. App. 685, 692–93, 67 P.3d 1147, rev. denied 150 Wash. 2d 1024, 81 P.3d 120 (2003); *State v. Smissaert*, 41 Wash. App. 813, 815, 706 P.2d 647 (1985).'

"123 Wash. App. at 781–82, 98 P.3d at 1263. *See also State v. Frank*, 364 N.W.2d 398, 400 (Minn. 1985) ('Most jurors have some experience with the effects of excessive alcohol consumption and therefore, in an ordinary case, will not need expert assistance.')."

*Wiggins v. State*, 193 So.3d 765, 801–02 (Ala. Crim. App. 2014).

The circuit court correctly summarily dismissed this claim because Woods failed to satisfy the pleading requirements of Rule 32.6(b), Ala. R. Crim. P. Woods is due no relief.

. . .

Woods argues that the circuit court erred in summarily dismissing his claim that his trial counsel was ineffective for failing to request an instruction on manslaughter as a lesser-included offense. In his petition, Woods pleaded the following:

"Trial counsel was constitutionally ineffective in failing to request a jury instruction on the lesser-included offense of manslaughter. If counsel had made such a request, the instruction should have been given, since the evidence adduced at trial reasonably supported a manslaughter theory. See Section IX, supra (incorporated by reference); *see also Ex parte Oliver*, 518 So. 2d 705, 706 (Ala. 1987) . . . ; *see also* Ala. Code § 13A–1–9(b)

> (requiring rational basis for court to charge the jury on included offense)."

(C.R.409.) Again, Woods failed to fully plead this claim. Woods references the substantive issue in section IX of his Rule 32 petition where he argued that the circuit court erred in failing to give a manslaughter instruction; however, in this section of Woods's petition Woods was pleading that his trial counsel was ineffective. Woods had the added burden of pleading how he was prejudiced by counsel's failure to request a jury charge on manslaughter. Woods failed to do so. Accordingly, Woods "failed to not only plead sufficient facts, but also failed to plead prejudice." *Lee v. State*, 44 So. 3d 1145, 1170 (Ala. Crim. App. 2009).

Indeed, the record establishes no rational basis for an instruction on manslaughter as a lesser-included offense. Markesha Williams, who testified in Woods's behalf, said that the second time the officers came to the apartment Woods was "outside messing with some speakers in his car." (Trial R. 1447.) At sentencing, Woods testified in his own behalf and the following occurred:

> "[Defense counsel]: Were you doing the drugs as you sold them?
>
> "[Woods]: Nah, I wasn't smoking crack. I would snort powder.
>
> "[Defense counsel]: You would snort the powder?
>
> "[Woods]: Yes.
>
> "[Defense counsel]: And how much of the powder would you snort a day?
>
> "[Woods]: Probably like about three grams.
>
> "[Defense counsel]: About three grams? Did you have a habit?

"[Woods]: Not really a habit. I do it just to stay up two or three days."

(Trial R. 1831–32.)

The circuit court correctly summarily dismissed this claim because Woods failed to plead how he was prejudiced by the failure to give an instruction on manslaughter as a lesser-included offense. See Rule 32.6(b), Ala. R. Crim. P. Woods is due no relief.

. . .

Woods next argues that the circuit court erred in summarily dismissing the remainder of his ineffective-assistance-of-counsel claims. Specifically, he argues that his counsel was ineffective for failing to investigate Woods's and Spencer's differing roles in selling drugs out of the apartment they shared and that trial counsel was ineffective for failing to obtain the transcript of Spencer's trial.

In his petition, Woods merely pleaded the following:

"Trial counsel failed to investigate and present evidence about the role Mr. Woods and Kerry Spencer played in the drug house. This evidence would have shown that Spencer was in charge and that Mr. Woods followed Spencer's leadership. By contrast, the State argued at trial that Mr. Woods was in charge and therefore planned the shootings. If trial counsel had investigated and presented this evidence, the State would not have been able to make this prejudicial argument.

"Trial counsel failed to obtain the complete record from Kerry Spencer's trial. The complete record was critical to anticipating and effectively countering the prosecution's case at Mr. Woods's trial."

(C.R.409–10.) Woods failed to plead how he was prejudiced by counsel's alleged failure to investigate the role Spencer and Woods had in the sale of drugs from the apartment and counsel's failure to obtain the transcript of Spencer's trial. Thus, Woods failed to plead the full facts in regard to this claim, and the circuit court correctly summarily dismissed the claim because it failed to meet the specificity requirements of Rule 32.6(b), Ala. R. Crim. P. Woods is due no relief on this claim.

*Woods*, 221 So. 3d at 1135-45 (footnotes omitted).

In sum, assuming this guilt-phase-ineffective-assistance-of-trial-counsel claim was not procedurally barred, the state courts did not unreasonably apply Supreme Court precedent or unreasonably determine the facts in holding that Woods failed to state a claim for relief. The state courts reasonably recognized and applied the applicable law, *Strickland*, in finding that Woods had not sufficiently pled the two-part test for ineffective assistance of counsel claims. Indeed, many of the guilt-phase-ineffective-assistance-of-trial-counsel sub-claims correspond to Woods's claims of substantive constitutional violations that have previously been discussed and rejected on their merits in parts IV. A-X of this opinion. Failure to raise meritless arguments will not render counsel's performance ineffective. *Diaz v. Sec'y for Dep't of Corr.*, 402 F.3d 1136, 1142 (11th Cir. 2005). Woods is not entitled to relief on his guilt-phase-ineffective-assistance-of-trial-counsel claim.

### BB. Woods's claim that he was denied effective assistance of trial counsel during the penalty phase of his trial

Woods raises five sub-claims within this claim. First, he argues that trial counsel was ineffective for failing to investigate and present mitigation evidence about his family history, educational background, mental limitations, experience of abuse and abandonment by trusted authority figures, and struggle with drug use. Second, he contends that trial counsel was ineffective for failing to advise him adequately about the risks of testifying on his own behalf at the penalty phase of his trial. Third, Woods argues that trial counsel was ineffective for failing to present evidence establishing that he was mentally retarded. Fourth, Woods contends that trial counsel was ineffective for failing to properly elicit testimony from mitigation witnesses Synthia Sherman (Woods's aunt), and Shena Carter (Woods's cousin), and for asking mitigation witnesses Ms. Sherman, Ms. Carter, Pamela Woods (Woods's mother) and Stephanie Claybion (a family friend) to give their opinions on an appropriate sentence for Woods, thereby "opening the door" to sentencing recommendations by the State's witnesses Bobbie Owen, Susan Bennett, and Stacy Sellers, the three slain officers' widows, that Woods receive the death penalty. Fifth, Woods argues that trial counsel was ineffective for failing to object to the trial court's double counting of the aggravating circumstance that two or more persons were killed "by one act or pursuant to one scheme or course of conduct" in the penalty phase, even though this circumstance had already been established by

virtue of the jury's guilty verdict; failing to object to the trial court's failure to consider uncontradicted mitigating evidence; failing to object to the trial court's allegedly erroneous instructions on how to weigh aggravating and mitigating circumstances in reaching a sentencing recommendation, including the fact that if jurors concluded that the aggravating and mitigating circumstances were equally balanced, they should vote for a life sentence; and failing to object at the trial court's sentencing hearing to the introduction of the threatening letter Stacy Sellers received from Woods.

This entire claim is a nearly verbatim recitation of a claim Woods raised in his Rule 32 petition. However, it does not appear that Woods raised this claim, either in its entirety or in part, in his appeal of the Rule 32 denial to the Alabama Court of Criminal Appeals. Accordingly, the claim has not been exhausted and is not properly before this Court. *See Bailey*, 172 F.3d at 1305. Although Woods contends that the Alabama Court of Criminal Appeals and the Alabama Supreme Court were "well aware" that he was challenging the summary nature in which the Rule 32 court dismissed *all* of his ineffective assistance of counsel claims, Woods was required to "present the state courts with the same claim he urges upon the federal courts." *Picard*, 404 U.S. at 276, 92 S. Ct. at 512; *see also McNair*, 416 F.3d at 1302.

In the alternative, even if the claim was not procedurally barred, Woods is not entitled to relief pursuant to 28 U.S.C. § 2254(d). The Rule 32 court correctly dismissed this entire claim as insufficiently pleaded under Rules 32.3 and 32.6(b) because Woods failed to plead facts sufficient to show that he was entitled to relief. The court explained:

> In the case at hand, Woods's conclusory allegations of IAC during the penalty phase of his trial are insufficient to raise a cognizable IAC claim. For example, the allegation raised in paragraph 201 states, in its entirety:
>
> > In addition, Mr. Woods was denied effective assistance because defense counsel failed to object to the trial court's failure to consider uncontradicted mitigating evidence. See Section XXVII, supra (incorporated by reference); *see also Parker v. Dugger*, 498 U.S. 308 (1991); *Eddings*, 455 U.S. at 113; *Ex parte Henderson*, 616 So. 2d 348, 350 (Ala. 1992).
>
> (Pet. at 106.) This assertion simply does not state a proper claim for relief. Instead, it consists only of naked allegations unsupported by specific facts. Although Woods argues that he was denied effective assistance of counsel because counsel did not object to the trial court's "failure to consider uncontradicted mitigating evidence," he does not even identify what that mitigating evidence was. Woods failed to plead any specific facts supporting his claim that counsel's performance was deficient. Nor has he pleaded any specific facts indicating that there existed a reasonable probability that, but for counsel's allegedly deficient performance, the result of the proceeding would have been different. This claim falls far short of satisfying the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b). Woods's incorporation by reference of "Section XXVII" of his petition (*see* Pet. at 106), does not cure this deficiency. Incorporating by reference facts

> from one claim to another does not lower Rule 32's pleading
> requirements, and Woods's IAC claim did not satisfy those
> requirements, even with the incorporation [of] facts from claim
> XXVII. Notably, the claim that Woods raised in Section XXVII of his
> petition also fails to identify exactly what mitigating evidence the trial
> court allegedly failed to consider. (*See* Pet. at 69) Thus, incorporation
> by reference did not satisfy the specificity in pleading requirements.

Vol. 30, Tab #R-62, at C. 89-90. The Rule 32 court also dismissed the particular

sub-claim that trial counsel was ineffective for failing to investigate, uncover, and

present mitigating evidence as precluded by Rule 32.2(a)(4) and facially meritless.

As that court explained, since the Alabama Court of Criminal Appeals had already

rejected that particular sub-claim on direct appeal, the circuit court could not

consider it pursuant to Rule 32.2(a)(4). Although the Eleventh Circuit has held that

preclusion due to Rule 32.2(a)(4) is not a bar to habeas review, *see Williams*, 791

F.3d at 1274-76, the claim is still due to be dismissed pursuant to 28 U.S.C. §

2254(d) for the following reasons.

As the Alabama Court of Criminal Appeals explained on direct review,

Woods's claim of inadequate mitigation investigation was unsupported by the

record and that he provided nothing showing that he was prejudiced:

> Woods contends that he was denied the effective assistance of
> counsel during the penalty phase of his trial because, he says, his
> attorneys did not meet the minimum standards for representation of a
> defendant facing the death penalty set forth in the American Bar
> Association ("ABA") guidelines. Specifically, he appears to argue that
> counsel's performance did not meet the guidelines because counsel

did not consult with a mitigation expert and because counsel did not present evidence of additional mitigating factors, such as his mental state and that he was acting under extreme duress or the domination of another person. These arguments were not raised below, so we review them under the plain-error rule. *See* Rule 45A, Ala. R. App. P.

The principles governing our review of this argument were set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). . . .

The record before us contains no support for Woods's allegations. Before trial the prosecutor stated that he was not familiar with Rita Briles, one of Woods's attorneys, and he wanted to be sure that they were "not running into some issue here where she doesn't statutorily qualify to be appointed in a capital case." (R. 78.) Briles informed the court that she had 12 years' experience and the court stated that she appeared to be qualified. Co-counsel Cynthia Umstead then stated: "In addition to that, Judge, both Ms. Briles and I meet the ABA standards for appointed counsel as recently passed or adopted by the Circuit Court Judges Association of having the 12 hours of capital litigation training every other year." (R. 78.) However, the record before us contains no evidence about the scope of counsel's mitigation investigation, about which Woods now appears to complain. The record does reflect that during a pretrial hearing held on December 3, 2004, the trial court granted a defense motion for funds for a private investigator and informed Woods that if he required additional funds he could file a motion to establish the need for the funds. The court then considered a defense motion to retain a psychologist. Woods argued that he needed the evaluation for "mitigating purposes," and the trial court stated: "If you want a mitigation expert, which I assume that's what it sounds like you are asking for, I will give you twenty-five hundred dollars for that and you can use whoever you want to." (R. 44.) Thus, Woods's assertion that trial counsel "conducted an inadequate investigation into possible mitigating evidence" (Woods's brief at p. 70) is unsupported by the record and, in fact, the record provides an inference that counsel intended to hire a mental-health expert as part of their mitigation investigation. Furthermore, this

Court has quoted with approval the following from *Grayson v. Thompson*, 257 F.3d 1194 (11th Cir. 2001):

> "'An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore, "where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment."' *Chandler v. United States*, 218 F.3d 1305, 1314 n. 15 (11th Cir. 2000) (en banc) (quoting *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999))."

257 F.3d at 1218. *See, e.g., Brooks v. State*, 929 So. 2d 491, 497 (Ala. Crim. App. 2005); *Robitaille v. State*, 971 So. 2d 43, 73 (Ala. Crim. App. 2005) (both cases quoting *Grayson* ). Based on the record before us, we conclude that Woods has failed to establish that counsel's performance was deficient.

As to the prejudice prong, Woods argues that "there is a reasonable probability that had counsel conducted a reasonable investigation into possible mitigating evidence, the balance between the aggravating circumstance [s] and the mitigating circumstances would have tipped further in favor of a sentence of life imprisonment without the possibility of parole." (Woods's brief at p. 69.) However, other than a brief assertion that counsel failed to "put on evidence of [Woods's] mental state" (Woods's brief at p. 69), Woods has not identified any specific mitigating evidence that existed that he believes counsel failed to discover and present. Significantly, we have nothing in the record before us regarding Woods's mental state, and the record is equally silent as to any additional mitigating factors that allegedly existed but were not discovered or presented by defense counsel. Furthermore, nothing in the record before us indicates that, if some as-yet-unidentified evidence had been offered as mitigation, the jury would have recommended a sentence of life imprisonment without parole and that the trial court would have imposed a sentence of life imprisonment without parole.

This Court will not find plain error with regard to trial counsel's performance based on an argument supported by only speculation from a silent record.

*Woods*, 13 So. 3d at 36-38.

Woods specifies the following details that he said should have been more fully investigated and brought out in mitigation by his trial counsel: his mother severely beat him as a child and frequently kicked him and his siblings out of the house; he was consistently exposed to drugs and alcohol and left unsupervised as a child; his father dealt crack cocaine in his presence; he was homeless for several years; his father physically abused his mother in his presence; after his mother divorced his father, her subsequent boyfriends abused him and others; and he was also physically and emotionally abused and subjected to deplorable living conditions while attending Reach-Holyland, a religious institution located in Emelle, Alabama, around the age of 16. Woods also argues that trial counsel should have retained a social worker and a psychologist as expert witnesses to testify about how his poor upbringing predisposed him to engage in criminal behavior. However, Woods has not established that, had his attorneys investigated and proffered the aforementioned information, the result of his proceeding would have been different.

It is well established with regard to ineffective assistance claims that defense counsel has "a duty to make reasonable investigations" of potential mitigating evidence or "to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003) (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066). In any ineffectiveness case, an attorney's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 521-22, 123 S. Ct. at 2535 (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066). However, counsel's duty to investigate "does not necessarily require counsel to investigate every evidentiary lead." *Williams v. Allen*, 542 F.3d 1326, 1337 (11th Cir. 2008). "Under *Strickland*, strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* (quotation marks and citations omitted). *Compare Strickland*, 466 U.S. at 699, 104 S. Ct. at 2070 (stating that counsel's "decision not to seek more character or psychological evidence than was already in hand was . . . reasonable"), *with Porter v. McCollum*, 558 U.S. 30, 39-40, 130 S. Ct. 447, 453 (2009) (noting that counsel "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service," and "[t]he decision

not to investigate did not reflect reasonable professional judgment"). With regard to assessing prejudice flowing from counsel's performance, courts are required to "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in re-weighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98, 120 S. Ct. at 1515. "That same standard applies—and will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears v. Upton*, 561 U.S. 945, 955, 130 S. Ct. 3259, 3266-67 (2010). Again, where a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069.

Here, counsel did not fail to investigate for mitigation purposes, but in fact retained a mitigation specialist. Counsel also had three close family members and one friend testify at Woods's penalty phase. Each witness either expressly or impliedly acknowledged that Woods's circumstances in life were difficult, but they each also testified as to their opinions that Woods possessed a loving and caring nature, specifically noting that he was devoted to his three children. In sum, there

is no reasonable probability that the jury would have recommended, or that the judge would have imposed, a non-death sentence if they had been confronted with some of the other examples of Woods's difficult upbringing that Woods asserts his counsel should have discovered and introduced. *See Robinson v. Moore*, 300 F.3d 1320, 1347 (11th Cir. 2002) ("While the additional mitigation witnesses procured by Robinson's [post-conviction] counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of Robinson's life, these aspects of his life were nonetheless known to the resentencing jury and trial judge."); *Grayson v. Thompson*, 257 F.3d 1194, 1227-28 (11th Cir. 2001) ("Although the graphic picture of Grayson's home life painted at the state habeas proceedings was not presented at trial, the judge did not wholly disregard Grayson's unfortunate background in sentencing him to death. In light of the horrendous nature of this crime, we find no reasonable probability that the sentence would have been different if the judge and jury had possessed detailed information regarding Grayson's history."). Habeas relief is not warranted on this claim.

## CC. Woods's claim that he was denied effective assistance of appellate counsel

Woods raises three sub-claims within this claim. First, he argues that appellate counsel was substantially impaired by an actual conflict of interest in his

representation of Woods on appeal as a direct result of his previous role as defense trial counsel for Woods's co-defendant, Kerry Spencer. Second, Woods argues that appellate counsel failed to request that the Alabama Court of Criminal Appeals conduct a meaningful proportionality review of Woods's death sentence on appeal. Third, Woods argues that appellate counsel was ineffective for failing to raise 26 claims that Woods contends would have been meritorious on appeal. These 26 claims are the substantive claims that Woods has raised that were previously discussed and rejected in sections D(a)-(c), E, F, G, I, J, K, L, N, O, P, Q, R, S, T, U, V, W, X, Y, and Z of this opinion.

This entire ineffective-assistance-of-appellate-counsel claim is a nearly verbatim recitation of the claim Woods raised in his Rule 32 petition. While it appears that he presented one of the three sub-claims (the third) to the Alabama Court of Criminal Appeals, he failed to raise the *entire* claim in the Alabama Court of Criminal Appeals or in his petition for certiorari the Alabama Supreme Court, and so the claim has not been exhausted and is not properly before this Court. *See, e.g., Bailey*, 172 F.3d at 1305.

In the alternative, even if the claim was not procedurally barred, Woods is not entitled to relief pursuant to 28 U.S.C. § 2254(d). The circuit court correctly dismissed this entire claim as insufficiently pleaded under Alabama Rules of

Criminal Procedure 32.3 and 32.6(b) because Woods failed to plead facts sufficient

to show that he was entitled to relief. As the court explained:

> Woods's conclusory allegations that he was denied effective assistance
> of appellate counsel are insufficient to raise a cognizable IAC claim.
> For example, in paragraph 219 of his petition, Woods contends that
> "appellate counsel was ineffective in failing to raise a number of
> meritorious issues in Mr. Woods's appellate brief that, if raised, would
> have required the reversal of Mr. Woods's conviction and sentence."
> (Pet. at 116) Woods follows this sentence with a lengthy list of assorted
> issues, none of which is supported by specific facts. This assertion
> simply does not state a proper claim for relief. Instead, his "claim"
> consists only of bare allegations and speculative, conclusory
> statements. Further, the fact that Woods incorporates by reference
> other claims set forth in this petition does not render his IAC claims
> sufficiently pleaded. As noted above, incorporating by reference facts
> from one claim to another does not lower Rule 32's pleading
> requirements. Here, even with the incorporation of facts from other
> claims in his petition, Woods has failed to plead specific facts
> sufficient to show that counsel's performance was deficient or that but
> for this allegedly deficient performance, the result in Woods's case
> would have been different.

(Vol. 30, Tab #R-62, at C. 92-95). When Woods appealed the Rule 32 denial,

raising only the third sub-claim specifically, the Alabama Court of Criminal

Appeals stated:

> Woods also argues that his appellate counsel was ineffective for failing
> to raise multiple issues on direct appeal. Woods merely recites a 2–
> page laundry list of 26 issues that he says appellate counsel was
> ineffective for failing to raise in his brief on direct appeal before this
> Court. . . .
>
> To adequately plead a claim that counsel was ineffective for failing to
> raise certain issues on direct appeal, the petitioner must do more than

merely recite a laundry list of issues that he or she says should have been raised. *See Carruth v. State*, 165 So. 3d 627, 647 (Ala. Crim. App. 2014). Also, the sections in Woods's petition that are referenced in the above-cited quote are sections in the petition in which Woods argued the substantive issues concerning each claim of ineffective assistance of trial counsel. However, in this section of Woods's postconviction petition, Woods was arguing that his appellate counsel was ineffective. Therefore, Woods had the added burden of pleading specific facts as to how he was prejudiced by appellate counsel's failure to raise the above-cited 26 issues. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). Woods failed to plead the full facts in regard to this claim; therefore, it was correctly summarily dismissed. *See* Rule 32.6(b), Ala. R. Crim. P.

Moreover, on direct appeal, this Court addressed and found no error in the following issues, some of which are cited above: that the testimony concerning the computerized search for Woods's name was admissible, that there was no error in the admission of collateral bad-act evidence, that the evidence was sufficient to support Woods's convictions and to establish Woods's guilt based on the accomplice-liability doctrine, that evidence from the victim's widow about the appropriate sentence was appropriate in rebuttal, and that based on the record Woods was not denied the effective assistance of counsel at sentencing.

Also, in its order dismissing Woods's petition, the circuit court specifically found that there was no merit to the following claims: that the circuit court erred in severing his case from that of his codefendant's, that the prosecutor committed misconduct in its closing arguments, that the circuit court erred in admitting improper victim-impact evidence at the guilt phase, that the circuit court engaged in double counting in sentencing Woods's [sic] to death, that the circuit court erred in admitting prejudicial photographs of the victims, and that the circuit court improperly constructed the strike list. We agree with the circuit court's findings in regard to this claim.

Furthermore,

"[a]ppellate counsel is presumed to exercise sound strategy in the selection of issues most likely to afford relief on appeal. *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993), cert. denied, 510 U.S. 984, 114 S. Ct. 487, 126 L.Ed.2d 437 (1993). One claiming ineffective appellate counsel must show prejudice, i.e., the reasonable probability that, but for counsel's errors, the petitioner would have prevailed on appeal. *Miller v. Keeney*, 882 F.2d 1428, 1434 and n. 9 (9th Cir. 1989)."

*Thomas v. State*, 766 So. 2d 860, 876 (Ala. Crim. App. 1998).

The circuit court correctly summarily dismissed this claim because Woods failed to plead how he was prejudiced by appellate counsel's failure to raise any of the 26 issues on direct appeal. *See* Rule 32.6(b), Ala. R. Crim. P. Woods is due no relief on this claim.

*Woods*, 221 So. 3d at 1147, 1149-50. With regard to this third sub-claim specifically, these courts' determinations were neither contrary to nor an unreasonable application of clearly established Federal law, nor were they unreasonable determinations of the facts, and Woods is not entitled to relief. *See Borden,* 646 F.3d at 812-13. Woods continues to fail to demonstrate that his appellate counsel's performance was deficient in failing to raise these arguments, *see Burger v. Kemp*, 483 U.S. 776, 784, 107 S. Ct. 3114, 3121 (1987) ("the process of winnowing out weaker claims on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy") (internal quotation marks omitted), much less how the outcome of his appellate

proceeding would have differed had counsel raised any of these 26 substantive issues.

### DD.  Woods's claim that he was denied effective assistance of counsel during his Rule 32 proceedings pursuant to *Martinez v. Ryan*

Woods includes six sub-claims within this claim: (1) post-conviction counsel were ineffective for failing to raise the claim in Woods's Rule 32 proceedings that his trial counsel were ineffective for failing to adequately advise Woods about the dangers of rejecting the State's plea offer; (2) post-conviction counsel were ineffective for failing to raise the claim in Woods's Rule 32 proceedings that his appellate counsel was ineffective for failing to ensure that the jury questionnaires or jury list was included with the record on direct appeal; (3) post-conviction counsel were ineffective for failing to raise the claim in Woods's Rule 32 proceedings that his appellate counsel was ineffective for raising an unreviewable claim on direct appeal of ineffective assistance of trial counsel for failing to fully investigate Woods's case for mitigation before the penalty phase of the trial; (4) post-conviction counsel were ineffective for failing to raise the claim in Woods's Rule 32 proceedings that his appellate counsel was ineffective for abandoning Woods's appeal of his attempted murder conviction; (5) trial, appellate, and post-conviction counsel were all ineffective for failing to challenge the constitutionality of Alabama's capital statutes under *Ring v. Arizona* and *Hurst v. Florida*, discussed

*supra*, and the sub-sub-claim that Woods's death sentence is in fact unconstitutional under those cases; and (6) post-conviction counsel were ineffective for failing to exhaust Woods's claims in state court.

As an initial matter, the claims that post-conviction counsel were ineffective for failing to raise ineffective-assistance-of-*appellate*-counsel claims (sub-claims (2), (3), and (4)) are precluded because *Martinez* specifically addressed claims of ineffective assistance of *trial* counsel which were not raised in the initial post-conviction proceeding, *see* section III. E. 1., *supra*, not claims of ineffective assistance of *appellate* counsel. Indeed, the Supreme Court has repeatedly emphasized the narrowness of *Martinez's* holding. *See Martinez*, 566 U.S. at 16, 132 S. Ct. at 1320 ("The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings . . . ."); *Trevino*, 133 U.S. at 428, 133 S. Ct. at 1921 (applying *Martinez's* "narrow exception" to *Coleman's* general rule). To the extent Woods suggests that his ineffective assistance of appellate counsel claims should also be considered under *Martinez*, this Court declines to do so. The Eleventh Circuit has not published an opinion on this issue, but the majority of the other circuits to have considered the issue have rejected a habeas petitioner's proposal to extend *Martinez* in the way that Woods suggests here. *See Reed v. Stephens*, 739 F.3d 753,

778 n.16 (5th Cir. 2014) ("To the extent Reed suggests that his ineffective-assistance-of-appellate-counsel claims also should be considered under *Martinez*, we decline to do so."); *In re Sepulvado*, 707 F.3d 550, 554 & n.8 (5th Cir. 2013) (noting that *Martinez*, by its terms, applies only to ineffective-assistance-of-trial-counsel claims); *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) ("Under *Martinez*'s unambiguous holding our previous understanding of *Coleman* in this regard is still the law—ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel."); *Banks v. Workman*, 692 F.3d 1133, 1148 (10th Cir. 2012) ("*Martinez* applies only to a prisoner's procedural default of a claim of ineffective assistance at trial, not to claims of deficient performance by appellate counsel.") (internal quotation marks and emphasis omitted); *but see Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1296 (9th Cir. 2013) (holding that *Martinez* extends to Sixth Amendment ineffective-assistance-of-appellate-counsel claims). In sum, the fact that Woods's Rule 32 counsel did not present certain ineffective-assistance-of-appellate-counsel claims cannot serve as cause for the default. Accordingly, since sub-claims (2), (3), and (4) are being raised for the first time in habeas, they are not properly before the Court because they have not been exhausted.

Turning to sub-claim (1), Woods claims that his trial counsel were ineffective for failing to adequately inform him of the dangers of rejecting the State's plea offer, and he is able to excuse the procedural default of this claim through *Martinez* because his post-conviction counsel were ineffective for failing to raise this claim in his Rule 32 petition. This claim is based on Woods's allegation that after his co-defendant Kerry Spencer was convicted and sentenced, the State offered Woods a 20-to-25-year prison sentence in exchange for Woods's plea of guilty to a non-capital charge. Woods argues that his trial counsel were constitutionally ineffective in failing to advise him to accept it "in light of the strong accomplice liability theory the State could pursue at trial" in order to convict Woods. (Doc. 29 at 14.) However, contrary to Woods's assertion that "the State of Alabama does not dispute Mr. Woods's contention that this plea offer existed and was viable prior to trial" (*see id.*), Respondent *does* in fact dispute Woods's claim that a plea offer existed. Indeed, Respondent states, "Woods offers no citation to any location in the record discussing a plea offer or his feelings concerning said plea offer, nor does he provide additional supporting documentation addressing the issue." (Doc. 27 at 89.) Under these circumstances, the Court agrees with Respondent that this claim is due to be dismissed because Woods has not sufficiently pleaded any facts supporting it. The burden of proof is on the habeas petitioner "to establish his right

to habeas relief and he must prove all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008). With nothing but bare allegations, Woods cannot establish that the underlying ineffective-assistance-of-trial-counsel claim is a "substantial" one, as is required before a habeas petitioner may be able to have the procedural default of such a claim excused pursuant to *Martinez. See* 566 U.S. at 14, 132 S. Ct. at 1318.

Regarding sub-claim (5) and its sub-sub claim, Woods argues that *all* of his attorneys to date failed him by not challenging the constitutionality of Alabama's capital sentencing statutes under *Ring* and *Hurst*, and that he in fact is due to have his conviction overturned pursuant to the holdings in those cases. As previously discussed in section IV. K., *supra*, this line of cases originated with *Apprendi*, where the Supreme Court held that any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict" is an "element" that must be submitted to a jury. 531 U.S. at 494, 120 S. Ct. at 2635. In *Ring*, the Supreme Court "concluded that Arizona's capital sentencing scheme violated *Apprendi*'s rule because the State allowed a judge to find the facts necessary to sentence a defendant to death." *Hurst*, 136 S. Ct. at 621. In *Hurst*, the Supreme Court invalidated Florida's capital sentencing scheme, reiterating that a jury, and

not a judge, must find the existence of an aggravating factor to make a defendant death-eligible. *See id.* at 621-22.

As an initial matter, with regard to Woods's claim that all of his counsel should have raised *Hurst* claims, *Hurst* was not decided until January 12, 2016. Post-conviction counsel filed their brief in the Alabama Court of Criminal Appeals on November 23, 2011, and so counsel cannot be faulted for failing to discuss *Hurst* prior to that opinion's existence.

Turning to Woods's claim that all of his counsel to date should have raised *Ring* claims, the allegations that appellate counsel and post-conviction counsel were independently ineffective for failing to raise this issue are precluded because, as previously discussed in this section, *Martinez* only excuses the procedural default of claims concerning the underlying alleged ineffective assistance of trial counsel, not appellate counsel. Nor does it provide a vehicle to allege freestanding claims of ineffective assistance of state post-conviction counsel, which is the purpose for which Woods seeks to employ it here. *Lambrix*, 756 F.3d at 1262–63; *see also* 28 U.S.C. § 2261(e) ("The ineffectiveness or incompetence of counsel during State or Federal post-conviction proceedings in a capital case shall not be a ground for relief in a proceeding arising under section 2254."). As for the claim that post-conviction counsel were ineffective for failing to argue that trial counsel were ineffective for

failing to argue that Alabama's capital scheme violated *Ring*, by the time Woods's Rule 32 petition was filed in December 2008, it was a settled proposition that Alabama's capital sentencing statutes remained constitutional after *Ring*. *See Waldrop*, 859 So. 2d at 1188-90, *cert. denied*, 124 S. Ct. 430 (2003) (mem.). Because counsel is not ineffective for failure to raise a meritless argument, *see Diaz*, 402 F.3d at 1142, this claim also fails.

Woods also includes the sub-sub-claim that his capital sentence is in fact unconstitutional under *Ring* and *Hurst*. This claim is both precluded for lack of exhaustion and meritless. First, although Woods raised a *Ring* challenge on direct appeal, that claim was not exhausted because it was never presented to the Alabama Supreme Court. Therefore, the claim is not properly before this Court. *Bailey*, 172 F.3d at 1305. Second, the claim is meritless. Woods was unanimously convicted of four counts of capital murder: three violations of Ala. Code 13A-5-40(a)(5) for the deaths of the three police officers and one violation of Ala. Code 13A-5-40(a)(10) for the murder of two or more persons by one act or pursuant to one scheme or course of conduct. At the penalty phase, the State alleged four statutory aggravating circumstances: (1) Woods knowingly created a great risk of death to many persons, (2) the murders were committed for the purpose of avoiding or escaping a lawful arrest, (3) the murders were committed to disrupt or

hinder the lawful exercise of any government function or the enforcement of laws, and (4) two or more persons were killed pursuant to one scheme or course of conduct. The State also explained to the jury that the fourth of these factors had already been found by virtue of the jury's guilt-phase verdict (i.e., the alleged "double counting" that Woods complains of elsewhere in his petition). The court charged the jury on these four aggravating circumstances and explained that the jury could not consider the death penalty unless they found the existence of at least one aggravating circumstance beyond a reasonable doubt. The jury returned a 10–2 recommendation for death on each capital count. Because one of the four aggravating circumstances overlapped with the offense of which Woods was convicted—murder of two or more persons pursuant to one scheme or course of conduct —that aggravator was unanimously proven beyond a reasonable doubt for *Ring* purposes. The finding of a single aggravator, even a "double counted" aggravator, is all that is required to expose the defendant to the death penalty under Alabama law. Here, after making this finding, the jury recommended 10–2 that Woods be sentenced to death, and the trial court accepted that recommendation.

As the Alabama Supreme Court recently explained:

> Our reading of *Apprendi*, *Ring*, and *Hurst* leads us to the conclusion that Alabama's capital-sentencing scheme is consistent with the Sixth Amendment. As previously recognized, *Apprendi* holds that any fact that elevates a defendant's sentence above the range

established by a jury's verdict must be determined by the jury. *Ring* holds that the Sixth Amendment right to a jury trial requires that a jury "find an aggravating circumstance necessary for imposition of the death penalty." *Ring*, 536 U.S. at 585, 122 S. Ct. 2428. *Hurst* applies *Ring* and reiterates that a jury, not a judge, must find the existence of an aggravating factor to make a defendant death-eligible. *Ring* and *Hurst* require only that the jury find the existence of the aggravating factor that makes a defendant eligible for the death penalty—the plain language in those cases requires nothing more and nothing less. Accordingly, because in Alabama a jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death-eligible, Alabama's capital-sentencing scheme does not violate the Sixth Amendment.

Moreover, *Hurst* does not address the process of weighing the aggravating and mitigating circumstances or suggest that the jury must conduct the weighing process to satisfy the Sixth Amendment. This Court rejected that argument in *Ex parte Waldrop*, holding that the Sixth Amendment "do[es] not require that a jury weigh the aggravating circumstances and the mitigating circumstances" because, rather than being "a factual determination," the weighing process is "a moral or legal judgment that takes into account a theoretically limitless set of facts." 859 So. 2d at 1190, 1189. *Hurst* focuses on the jury's factual finding of the existence of an aggravating circumstance to make a defendant death-eligible; it does not mention the jury's weighing of the aggravating and mitigating circumstances. The United States Supreme Court's holding in *Hurst* was based on an application, not an expansion, of *Apprendi* and *Ring*; consequently, no reason exists to disturb our decision in *Ex parte Waldrop* with regard to the weighing process. Furthermore, nothing in our review of *Apprendi, Ring,* and *Hurst* leads us to conclude that in *Hurst* the United States Supreme Court held that the Sixth Amendment requires that a jury impose a capital sentence. *Apprendi* expressly stated that trial courts may "exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute." 530 U.S. at 481, 120 S. Ct. 2348. *Hurst* does not disturb this holding.

*Bohannon*, 222 So. 3d at 532-33. As noted above, the Supreme Court denied certiorari in *Bohannon*. If it were not procedurally barred, this sub-sub-claim would also be due to be denied on its merits because Alabama's capital sentencing statues do not violate *Ring* or *Hurst*.

Finally, the Court addresses Woods's sub-claim (6). Although his post-conviction counsel argued to both the Alabama Court of Criminal Appeals and the Alabama Supreme Court that the Rule 32 court should not have summarily dismissed each claim of ineffective assistance of trial and appellate counsel raised in Woods's Rule 32 petition, Woods faults post-conviction counsel for failing to appeal and address specifically the Rule 32 court's ruling that certain claims of ineffective assistance of trial and appellate counsel were precluded by Rule 32.2(a)(4). This sub-claim is precluded because *Martinez* does not provide a vehicle to allege freestanding claims of ineffective assistance of state post-conviction counsel, which is the purpose for which Woods seeks to employ it here. *Lambrix*, 756 F.3d at 1262–63; *see also* 28 U.S.C. § 2261(e). Second, the claim is insufficiently pleaded because Woods failed to allege with any degree of specificity that any of his unexhausted ineffective assistance claims were meritorious. Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts states that a petition must "state the facts supporting each ground," which Woods has failed to

do. *See also Blankenship*, 542 F.3d at 1270 (petitioner must prove all facts necessary to show a constitutional violation). Therefore, this sub-claim claim is due to be dismissed as insufficiently pleaded.

### EE. Woods's claim that his death sentence is constitutionally and statutorily invalid because Alabama is the last state to reject advisory verdicts in capital sentencing

Woods takes this claim from the supplemental brief of the defendant in *State v. Santiago*, 122 A.3d 1 (Conn. 2015), a Connecticut case, frequently quoting that brief verbatim or editing it only minimally. However, the *Santiago* case is inapposite, so Woods's attempt fails. Connecticut abolished the death penalty on April 25, 2012, by legislation with prospective effect; thus no defendants could be sentenced to death in that state from that point onward, but those inmates who already had death sentences imposed would still be subject to that punishment. *Santiago*, 122 A.3d at 7–8. The Connecticut Supreme Court ultimately held in *Santiago* that prospective abolition violated Connecticut's constitutional prohibition against cruel and unusual punishment. *See id.*

While Woods seems to imply that Senate Bill 16, codified at 2017 Alabama Laws Act 2017-131, abolished the death penalty in Alabama, he is wrong. Senate Bill 16 was enacted on April 11, 2017, and amended sections 13A-5-45, -46, and -47 of the Code of Alabama to remove the option for judicial sentencing in capital

sentencing. Whereas the judge had been the final sentencer after an advisory penalty-phase jury verdict, capital sentencing is now be left totally in the hands of the jury. There is no question as to the non-retroactivity of the act: by its terms, the act "shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to the effective date of this act [April 11, 2017]." And of course, the death penalty remains a legal sentence for those convicted of capital murder in Alabama. All along, Alabama juries have been tasked with finding an aggravating circumstance necessary to make defendants death-eligible, and judges have been obligated to consider their advisory penalty-phase verdicts. The only change is that as of April 11, 2017, these advisory verdicts are now binding.

However, even if Senate Bill 16 did have retroactive application, it would have no effect on Woods's sentence. Woods's jury recommended that he be sentenced to death, and the trial court accepted that recommendation. As this is not a "judicial override" case, even if Woods's jury had ultimately sentenced him, his sentence would be exactly what it is now: death on all four capital murder counts.

As a final matter, Woods's claim is not properly before this Court because the claim has not been exhausted. Inmates raised arguments against judicial

override long before April 2017, and nothing prevented Woods from doing so. Indeed, Woods challenged the constitutionality of Alabama's capital sentencing scheme, including the override provision, on direct appeal, even though there was no override in Woods's case. As that claim was not presented to the Alabama Supreme Court, however, it was never exhausted, and so it is not properly before this Court. *See Bailey*, 172 F.3d at 1305.

## V. CONCLUSION

For all of the reasons set forth herein, Woods's petition for writ of habeas corpus is due to be dismissed, or in the alternative denied.

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003) (internal quotations omitted). This Court finds

Woods's claims do not satisfy either standard. Accordingly, a motion for a certificate of appealability is due to be denied.

A separate order in accordance with this opinion will be issued.

**DONE** AND **ORDERED** ON JULY 18, 2018.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704